# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

REBECCA A. TURNER,                 :
     PLAINTIFF,              :
                              :
v.                            :         CIVIL ACTION NO.
                              :         3:12-cv-788(VLB)
                              :
EASTCONN REGIONAL EDUCATION   :
SERVICE CENTER; PAULA COLEN;    :
STEVEN WAPEN; DORIS DYER; THOMAS  :
CRONIN; and RONALD MORIN,       :
     DEFENDANTS.            :         MARCH 15, 2013

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [Dkt. #10]

The Plaintiff, Rebecca A. Turner ("Turner"), brings this action against the Eastconn Regional Education Service Center ("Eastconn") and against Eastconn employees' Doris Dyer ("Dyer"), Ronald Morin ("Morin"),Thomas Cronin ("Cronin"), Steven Wapen ("Wapen"), and Paula Colen ("Colen"). Turner, a teacher in Eastconn's Autism Program, asserts a plethora of violations of federal and state employment laws as well as several state contract and tort claims relating to the circumstances involving her leave and then termination from employment following a difficult pregnancy. Currently pending before the Court is a motion to dismiss filed by the Defendants seeking to dismiss certain claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). For the following reasons, the Court denies in part and grants in part Defendants' motion to dismiss as delineated in the conclusion.

**Factual Background**

Turner's employer, Eastconn, is a regional educational service center ("RESC") established by several local municipal boards of education pursuant to state law.  Conn. Gen. Stat. §10-66a provides that "[a] regional education service center may be established in any regional state planning area…upon approval by the State Board of Education of a plan of organization and operation submitted by four or more boards of education for the purpose of cooperative action to furnish programs and services."  *Id.*  The statutory framework provides that the "operation and management of any regional educational service center shall be the responsibility of the board of such center to be composed of at least one member from each participating board of education, selected by such board of education." Conn. Gen. Stat. §10-66b.

The statute further provides that "[a] regional educational service center shall be a body corporate and politic. The board of a regional educational service center shall be a public educational authority acting on behalf of the state of Connecticut and shall have the power to sue and be sued, to receive and disburse private funds and such prepaid and reimbursed federal, state and local funds as each member board of education may authorize on its own behalf, to employ personnel, to enter into contracts, to purchase, receive, hold and convey real and personal property and otherwise to provide the programs, services and activities agreed upon by the member boards of education."  Conn. Gen. Stat. §10-66c(a).  "Each board of a regional educational service center shall submit a

2

yearly budget and projected revenue statement to each member board of education and to the State Board of Education.  The accounts and financial records of all boards of regional educational service centers shall be audited annually in the same manner as the accounts of local or regional boards of education and copies provided to each member board of education and to the State Board of Education"  Conn. Gen. Stat. §10-66g.  "The board of a regional educational service center shall annually, following the close of the school year, furnish to each member board of education and the State Board of Education an evaluation of the programs and services provided by the board of the regional educational service center." Conn. Gen. Stat. §10-66h.  Further, "[a]ll state statutes concerning education, including provisions for eligibility for state aid and the payment of grants … with respect to bonds, notes or other obligations issued by a regional educational service center to finance building projects approved by the Commissioner of Education, shall apply to the operation of regional educational service centers." Conn. Gen. Stat. §10-66i.

The statutory framework authorizes each RESC to borrow and issue bonds in its own name, notes or other obligations for the purpose of carrying out or administering a RESC program, program or other function.  ."  Conn. Gen. Stat. §10-66c(b).  Any bonds, notes or other obligations issued by the RESC "shall not be obligations of the state of Connecticut or any municipality, and each such bond, note or other obligation shall so state on its face."  ."  Conn. Gen. Stat. §10-66c(c).  "Each board of education and nonpublic school in the area served by a regional educational service center may determine the particular programs and

services in which it wishes to participate in accordance with the purpose of this part."  Conn. Gen. Stat. §10-66d.  "The necessary administrative and overhead expenditures as determined by the board of the regional educational service center shall be shared jointly by the participating boards of education. In addition any participating board of education and nonpublic school shall be required to pay a prorated share of the costs of any program or service to which it subscribes."  Conn. Gen. Stat. §10-66e.  "[A]ny participating member of a board of a regional educational service center may revoke such participation by giving notice to such board of its intention to terminate its participation at least six months prior to the start of the fiscal year beginning July first." Conn. Gen. Stat. §10-66k(a).  However, "no withdrawal or termination of participation by any member board of education shall affect any pledge, agreement, assignment or mortgage of any income, revenue, proceeds or property of a regional educational service center made for the benefit or security of any bonds, notes or other obligations or any repayment obligations under any credit or liquidity facility provided pursuant to this chapter."  Conn. Gen. Stat. §10-66k(b).

Turner began working for Eastconn as an instructional assistant on November 4, 2008.  [Dkt. #1, Compl., ¶10].  She became a long-term substitute  in the Autism Program on April 8, 2009 and then hired as a Teacher on July 6, 2009 in the Autism Program, "which works with children with Autism Spectrum Disorders and other developmental disabilities, including children that have the recognized capacity to become aggressive and/or inflict harm on others."  *Id.* at ¶11. Dyer was the Autism/Clinical Director at Eastconn and Turner's direct

supervisor.  *Id.* at ¶3.  Morin was the Clinical Director at Eastconn and was Dyer's direct supervisor.  *Id.* at ¶4.  Cronin was the Director of Education Services and was Morin's supervisor.  *Id.* at ¶5.  Wapen was the Director of Human Resources for Eastconn.  *Id.* at ¶6.  Colen was Eastconn's executive director.  *Id.* at ¶7.

Turner became pregnant with twins which were due to be born on December 26, 2010.  *Id.* at ¶9.  She delivered her twins early on November 24, 2010.  *Id.*  Prior to her pregnancy, Turner received positive performance evaluations including her most recent performance evaluation dated May 28, 2010 by Dyer.  *Id.* at ¶16.  Turner alleges that she was unlawfully terminated on January 5, 2011 on the basis of her gender, pregnancy, physical disability and/or familial status and was subjected to a discriminatory scheme and/or hostile work environment "implemented by Dyer, whose conduct and demeanor became increasingly hostile and derogatory as Turner's pregnancy continued."  *Id.* at ¶18.  Turner alleges that she was denied accommodations for her pregnancy while another similarly situated employee, Allyson Carter, received accommodations while pregnant.  *Id.* at ¶20.

On April 26, 2010, Turner submitted a doctor's note to Dyer stating that she could not restrain students and as a result Eastconn did not require her to engage in restraining.  *Id.* at ¶22.  On September 8, 2010, Turner submitted an additional doctor's note to Dyer stating that she should not be working closely with children who can become aggressive.  *Id.* at ¶23.  Turner alleges that Dyer's response was to question whether she could perform her job, stating: "can you even work?"  *Id.* at ¶24.  Turner alleges that at an earlier point in Turner's

pregnancy, Dyer also had commented to Turner "you don't even look pregnant." *Id.* "On November 24, 2010, Turner's children were born prematurely. One was born with a cleft lip and is smaller than average and the other was diagnosed with intrauterine growth restriction ("IUGR"), being abnormally small. As a result, both children are subject to short- and long-term risks, including developmental issues." *Id.* at ¶45.

Turner contends that Dyer's demeanor became "cold and condescending from September 8, 2010 forward." *Id.* at ¶26. "On September 9 and 10, 2010, Turner did not work directly with student but was permitted to work on her administrative duties while Human Resources personal discussed Turner's situation. *Id.* at ¶¶27-28. "On September 13, 2010, Turner met Dyer, who told her she would have to take FMLA leave starting September 27, 2010, because she was unable to do her job." *Id.* at ¶29.

On September 14, 2010, Turner spoke with Wapen who "informed her that she would going to be made to take FMLA leave of September 27, 2010." *Id.* at ¶31. Wapen allegedly "informed Turner that according to Dyer there as 'non-classroom work' available but 'no safe place in the classroom.'" *Id.* Turner alleges Wapen said "there was no position available at that time to accommodate Turner and that her job would not be secure after 12 weeks passed." *Id.* at ¶32. Wapen advised her that she could request more time off after the FLMA leave period was completed. *Id.* at ¶33.Turner alleges that Dyer harassed her regarding her FMLA leave and "felt she was being watched and questioned constantly about her pregnancy." *Id.*

On September 15, 2010, Turner contacted her union's vice president and also emailed the vice president and president of the union.  *Id.* at ¶35.  On September 16, 2010, the union president informed Turner by email that if Turner could not do her job and there were no other positions, she would have to take FMLA leave.  *Id.* at ¶35.

On September 20, 2010, Turner met with Cronin, but no union representative was present as she requested.  *Id.* at ¶37.  At that meeting, Turner requested accommodations until her due date of December 26 2010 and expressed her concern about the lack of job security once her FMLA leave was used.  *Id.* at ¶37.  Turner alleges that Cronin told her that her request would be denied but that she could take as much time as she needed to be with her babies and return to work when she felt comfortable.  *Id.* at ¶38.  Turner alleges that Cronin further told her that she did not have to worry about losing her job as it was being covered by a substitute.  *Id.* at ¶39.   Turner and Cronin also discussed that Turner's job description stated that 90% of her job was in administrative capacity.  *Id.*  Turner alleges that Eastconn would not make reasonable accommodations and instead forced her to take FMLA leave earlier than needed "despite not being totally restricted from her work by her physician."  *Id.*

On September 22, 2010, Turner met with the union president and vice president, treasurer and another union member.  *Id.* at ¶40.  As that meeting, Turner alleges she was told that "another pregnant employee non-party Allyson Carter, at EASTCONN's Pace North Site was receiving accommodations to ensure her safety from children with behavioral problems and violent tendencies."  *Id.*

7

Turner contends that the union was not supportive towards her and did not "assist her in rectifying the situation." *Id.*

On September 24, 2010, Turner met with Cronin who told her to get her doctor's note changed to allow her to continue working in the classroom until her projected due date. *Id.* at ¶41. On September 27, 2010, Turner submitted a third doctor's note stating that she "could perform all of her job responsibilities with the exception of having one on one contact with aggressive children." *Id.* at ¶42. On September 30, 2010, Dyer informed Turner that she would be permitted to work until October 1, 2010. *Id.* at ¶43.

On October 1, 2010, Turner emailed Cronin regarding her third doctor's note. *Id.* at ¶44. Wapen responded to her informing her that her FMLA would start on Monday, October 4, 2010 despite the doctor's note. *Id.* Turner then met with Dyer and directly asked for accommodations. *Id.* at ¶45. Dyer informed her that it was out of her hands and that she did all she could. *Id.* Turner alleges that the Defendants failed to transfer her to a suitable available temporary position. *Id.* at ¶46.

On December 30, 2010, Turner asked Wapen orally for more leave time because of her children's health issues. *Id.* at ¶49. Wapen informed her that she would not receive any more leave and would be removed from the payroll. *Id.* at ¶50. Turner received a certified letter from Wapen stating that her employment was being terminated as of January 5, 2011, purportedly because she was not able to return to work. *Id.* After her termination, Eastconn changed the requirements for Turner's position to include a special education certification,

which Turner does not have.  *Id.* at ¶53.   Turner alleges that her position was filled by a non-pregnant woman.  *Id.* at ¶54.   On an unspecified earlier date, Turner alleges that she met with Morin to discuss her feelings that Dyer was not acting appropriately.  *Id.* at ¶47.   Morin told her that he would not do anything and that Colen was aware of her situation and approved of how she was treated. *Id.*

Turner's employment with Eastconn is governed by the Collective Bargaining Agreement ("CBA") between Eastconn and the Eastconn Federation of Teachers.  [Dkt. # 10, Attachment A, CBA].  The CBA provided a four-level grievance procedure to "equitably resolve any alleged breaches of this contract." *Id.* at Art 2.A.  Grievance is defined as a "violation of a specific term or terms of this contract to the detriment of a teacher or group of teachers or the Federation." *Id.* at Art 2.B.1.  The first level requires the grievant to file a written formal grievance with the immediate supervisor specifying the term or terms of the contract that the grievant believes has been breach.  *Id.* at Art D.1.  Within five days, the immediate supervisor is required to hold a meeting and within 4 days of that render a decision giving reasons in writing.  *Id.*  Level Two provides that the grievant may within 5 days after the decision or 7 days after the Level One meeting file the grievance with the Executive Director.  *Id.* at Art 2.D.2.  The Executive Director shall within five days meet with the grievant and within five days of that render a decision giving reasons in writing. *Id.*  Level Three provides that the grievant may within 5 days after the decision or 8 days after the Level Two meeting file the grievance with the Eastconn Board of Directors.  *Id.* at Art

2.D.3.  The Board shall within ten days meet with the grievant and within five days of that render a decision giving reasons in writing. *Id.*  Level Four provides for binding arbitration.  *Id.* at Art 2. D.4.  In connection with the grievance procedure, the "grievant may be represented at any level of the grievance procedure by a person of his own choosing provided, however, that such person shall not be an official or a representative of any other teacher organization.  When a teacher is not represented by the Federation, the Federation shall be notified and have the right to be present and to state its views at any level of the grievance procedure." *Id.* at Art 2.E.2.  Article 10 provided that "[a]n employee shall have the right to have a Federation representative present to observe ay any conference by an administrator to discuss matters which may affect the employee's position with respect to discharge, resignation or demotion. *Id.* at Art 10.A.

The CBA provided that it is recognized that the Eastconn Executive Board "has and will continue to retain, whether exercised or not, the sole and unquestioned right, responsibility and prerogative to direct the operation of EASTCONN in all its aspects, including but not limited to the following… [t]o discharge or otherwise discipline any employee…[;] [t]o promote, transfer, and lay off employees…[;] [i]n general, to control, supervise and manage the operations of EASTCONN and its professional staff under governing laws."  *Id.* at Art 1.B.6,7, and 13.  The CBA provided for unpaid pregnancy disability leave beyond any accumulated sick leave which "shall be available for such reasonable further period of time as a female employee is determined by her physician to be disabled from performing the duties of her job because of pregnancy or

conditions attendant thereto." *Id.* at Art 13.  It also provided for unpaid childbearing leave to any "certified tenured professional employee." *Id.* at Art 14.  The CBA also provided that Eastconn may grant an unpaid leave of absence upon which the teacher "shall be entitled to return to the same or similar position to the extent possible." *Id.* at Art 15.

Turner has asserted eighteen claims in her complaint. She has alleged that she was unlawfully discriminated against based on her gender, pregnancy physical disability, and/or familial status in violation of the Connecticut Fair Employment Practices Act  ("CFEPA"), Conn. Gen. Stat. §46a-60(a)(1),(5), and (7) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* and as amended by the Pregnancy Discrimination Ave, 42 U.S.C. §2000e(k) ("Title VII").  *Id.* at Counts 1 and 2.  Turner also alleged a violation of the Connecticut Family and Medical Leave Act, Conn. Gen. Stat. §31-51kk, *et seq.* ("CTFMLA")  as was as the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2611, *et seq. Id.* at Counts 3 and 5.  In addition, Turner asserts that the Defendants also violated the family and medical leave provision of the State Personnel Act, Conn. Gen. Stat. §5-248a, which apply to state employees.   *Id.* at Count 4.   Turner alleges that she was discriminated against on the basis of her physical or physiological impairments as a result of her pregnancy in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq. Id.* at Count 6.

Turner also asserts claims for breach of written or implied contract as to the Articles 3, 5, 10, 13, 15 of the CBA which governs her employment as well as

the Eastconn employee handbook. [Dkt. # 1, Compl., Count 7].[1]  She also asserts a claim for breach of the covenant of good faith and fair dealing on the same basis as her Count 7 breach of contract claim.  *Id.* at Count 8.  She claims  breach of oral contract and breach of the covenant of good faith and fair dealing on the oral contract on the basis that Cronin told her that she could take as much time as she needed to be with her babies and return to work when she felt comfortable.  *Id.* at Counts 9 and 10.  Turner brings claims for promissory estoppel, negligent misrepresentation, and fraud/ intentional misrepresentation on the basis of Cronin's comment.  *Id.* at Counts 11, 12, and 13.   Various claims of negligent supervision are asserted alleging that Morin failed to supervise Dyer who engaged in discriminatory conduct, that Cronin failed to supervise Morin who engaged in discriminatory conduct and that Colen failed to supervise Wapen, Cronin, Morin and Dyer.  *Id.* at Counts 14, 15, and 16.  Lastly, Turner alleges that the Defendants' conduct throughout her termination process resulted in the negligent and intentional infliction of emotional distress.  *Id.* at Counts 17 and 18.

  Legal Standard

   "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or

---

[1] Article 3 of the CBA governed teacher assignments and Article 5 governed teacher transfers.

'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (internal quotations omitted) "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*(internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949-50). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted).

The Court's review on a motion to dismiss pursuant to Rule 12(b)(6) is generally limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). In addition, the Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Here, both parties rely upon the May 6, 2009 letter responding to Plaintiff's request for Family Medical Leave, attached to the Motion to Dismiss as Exhibit B. [Dkt #15, Def.'s Mot. To Dismiss, Exhibit B]. Therefore, where Plaintiff had knowledge of the letter and both parties rely on the letter, the Court will consider the letter for the purposes of analyzing the pending motion to dismiss. *See Anderson v. Derby Bd. Of Educ.*, 718 F. Supp. 2d 258, 273 n.33 (D. Conn. 2010).

Lastly, in deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) the Court "may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir. 2007).

<u>Analysis</u>

I.    **Title VII and CEFPA Claims**

The Defendants move to dismiss Turner's Title VII and CFEPA claims that she was discriminated against on the basis of her gender, pregnancy and familial

14

status.[2]  Defendants argue that Turner cannot make out a *prima facie* case of discrimination under Title VII or CFEPA because she was not qualified for her position as she did not possess the appropriate certification.  They further argue that Turner has failed to plead an inference of discrimination because both the similarly situated individual receiving allegedly favorable treatment and her allegedly discriminatory supervisor were within the same protected class as Turner.  [Dkt. #10, Def. Mem., p. 4-10].   In addition, Defendants argue that her termination did not occur under circumstances giving rise to an inference of discrimination but rather the operation of and compliance with the FMLA.  *Id.* Lastly, Defendants argue that familial status is not a protected class under Title VII or CFEPA and therefore Turner's claims based on familial status should be dismissed.  [Dkt. #10, Def. Mem., p. 10].

Turner concedes that familial status is not a protected class and therefore the Court dismisses her claims based on "familial status."  [Dkt. #13, Pl. Mem., p. 13n.5].   In response, Turner argues that she has alleged a *prima facie* case of pregnancy discrimination under Title VII and CFEPA.  As Turner does not argue that she has asserted a separate Title VII claim based on her gender apart from her pregnancy, this Court construes her complaint to assert a single Title VII and CFEPA claim on the basis of pregnancy discrimination.  To the extent that is not

---

[2] It is well established that CFEPA claims proceed under the same analysis as Title VII claims. *Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002) (holding that the Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA); *McInnis v. Town of Weston*, 375 F. Supp. 2d 70, 85 (D. Conn. 2005).

the case, Turner fails to make any allegations that she suffered unlawful discrimination on the basis of her gender apart from her claim of pregnancy discrimination and therefore the Court dismisses such a separate claim based on gender alone.

"The pleading standard for employment discrimination complaints is somewhat of an open question in our circuit."  Hedges v. Town of Madison, 456 F. App'x 22, 23 (2d Cir. 2012).  The Second Circuit has explained that "[p]rior to 2002, we required that plaintiffs claiming employment discrimination plead a prima facie case under the *McDonnell–Douglas* framework, which in turn required the plaintiff to show "'(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'"  *Id.* (quoting *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).  However, "the Supreme Court in *Swierkiewicz v. Sorema N.A.* expressly held that an employment discrimination plaintiff need not plead a prima facie case of discrimination, indicating that notice pleading under Rule 8(a) was sufficient for employment discrimination act claims."  *Id.*  (internal quotation marks and citation omitted).  The Supreme Court's decision in *Swierkiewicz* came before *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal* and relied on the *Conley* standard which those cases rejected.  *Id.*  Consequently, "*Swierkiewicz's* reliance on *Conley* suggests that, at a minimum, employment discrimination claims must meet the standard of pleading set forth in *Twombly* and *Iqbal,* even if pleading a prima facie case is not required."  *Id.*  However, the Court need not address this issue because the

Plaintiff's complaint has alleged facts sufficient to state an employment discrimination claim on the basis of pregnancy under either standard.

Title VII was amended by the Pregnancy Discrimination Act ("PDA") to clarify that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).  "Like other claims of employment discrimination, claims under the PDA that cannot be directly proven are analyzed under the three-step burden shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)."  *Canales v. Schick Mfg., Inc.*, No.3:09cv253(MRK), 2011 WL 4345006, at *1 (D. Conn. Sept. 15, 2011).   To establish a *prima facie* case of pregnancy discrimination, a plaintiff must show that "'(1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) [either] her position remained open and was ultimately filled by a non-pregnant employee ... [or] the discharge occurred in circumstances giving rise to an inference of unlawful discrimination .'"  *Id.* (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 401 (2d Cir.1998)).  The burden of establishing a *prima facie* case of pregnancy discrimination is *de minimis.  Id.* at 2.  "A pregnancy discrimination claim under the CFEPA is analyzed similarly to a federal claim under Title VII, as amended by the Pregnancy Discrimination Act."

*Baron v. Maxam North America, Inc.*, No.3:11-cv-198(JCH), 2012 WL 1247257, at *4 (D. Conn. April 13, 2012).

"The PDA applies to 'women affected by pregnancy, childbirth, or related medical conditions,'—not just to women who *are* pregnant." *Canales*, 2011 WL 4345006, at *1 (quoting 42 U.S.C. § 2000e(k)) (emphasis in the original); *see .e.g., Helmes v. South Colonie Cent. Sch. Dist.,* 564 F.Supp.2d 137, 147 (N.D.N.Y.2008) ("Certainly, women who are pregnant at or very near the time of the adverse employment action are members of the protected class, as are women who are on maternity leave or recently have returned to work from maternity leave when the employment action occurs." )*; Briggs v. Women in Need, Inc.,* No. 10–CV–2265 (RRM)(JO), 2011 WL 3794157, at *6 (E.D.N.Y. Aug. 24, 2011) ("The time at which the plaintiff ceases being 'affected by pregnancy, childbirth, or related medical conditions' depends on the facts and circumstances of the particular case."); *Leichter v. St. Vincent's Hosp. & Med. Ctr. of New York,* No. 94 Civ. 7537(DAB), 2001 WL 1160748, at *6 (S .D.N.Y. Sept. 28, 2001) ("As the PDA makes clear, a plaintiff need not be pregnant at the time she suffered a discriminatory employment decision."); *Gaugaiz v. Laboratoires Esthederm USA, Inc.,* No. 98 Civ. 4465(LMN), 2000 WL 1528212, at *5 (S.D.N.Y. Oct. 16, 2000) ("Although [the plaintiff] was not pregnant at the time of her termination, the statute does not require pregnancy to be a member of the protected class."); *Shafrir v. Ass'n of Reform Zionists of Am.,* 998 F.Supp. 355, 363 (S.D.N.Y.1998) ("Even though plaintiff was neither pregnant nor ill at the time she was discharged, she had

recently given birth and was on maternity leave. Because she claims she was discharged because of childbirth, the PDA is properly invoked.").

The Defendants argue that Turner has failed to establish that she was qualified for the position because the position required a special education certification.   However, Turner has alleged that this requirement was only imposed after her termination and therefore it does not speak to whether she satisfactorily performed the duties required by the position at the time she held it. Turner has alleged that she received performance evaluations from Dyer, including her most recent evaluation dated May 28, 2010 and therefore she has alleged that she satisfactorily performed the duties required by the position at the time she held the position.  In addition the Plaintiff has pled that she was not terminated for cause.

Defendants next argue that Turner cannot demonstrate that her discharge occurred under circumstances giving rise to an inference of unlawful discrimination because Dyer was also a female and that Allyson Carter was a pregnant female.   Because Turner has asserted a claim of pregnancy discrimination, Dyer would not fall into that protected class as there are no allegations that she was also pregnant or had recently given birth.  The Defendants are correct though that Turner's allegation that a similarly situated pregnant employee, Allyson Carter, received favorable treatment would undermine any inference that the Defendants were motivated by anti-pregnancy animus.

Turner has nonetheless satisfied the fourth prong because she has alleged that her position remained open and was ultimately filled by a non-pregnant employee, which is sufficient to establish a *prima facie* case of pregnancy discrimination. *See e.g., Habe v. 33 Bayville Ave. Restaurant Corp.*, No.09-CV-1071, 2012 WL 113501, at * (E.D.N.Y. Jan. 13, 2012) (finding that plaintiff established prima facie where plaintiff was replaced by a non-pregnant employee); *Spadaro v. McKeon,* 693 F.Supp.2d 183, 190 (N.D.N.Y.2010) ("Viewing the facts presented in the light most favorable to Plaintiff, she has also met the fourth prong, namely that her position remained open, as suggested by her seeing the website posting of its availability shortly after her termination, and the filling of that position with a non-pregnant, male applicant, Mr. Vicente."). Defendants' motion to dismiss Turner's Title VII and CFEPA pregnancy discrimination claims are denied as Turner has pled facts sufficient to establish a *prima facie* case of pregnancy discrimination at the motion to dismiss stage

II.    Title VII and CEFPA Claims – Individual Liability

Defendants argue that the Title VII and CFEPA claims against the individual defendants should be dismissed because neither statute provides for liability against individual employees.  [Dkt. #10, Def. Mem., p. 11].  Turner concedes that the individual defendants cannot be held liable under Title VII and the Court therefore dismisses her Title VII claim against those defendants.  [Dkt. #13, Pl. Mem. p.13].  However, Turner argues that her CFEPA claim can survive against the individual defendants under Conn. Gen. Stat. §46a-60(a)(5).  The Connecticut Supreme Court has held that Section 46a-60(a)(1) of CFEPA "does not impose

liability on individual employees." *Perodeau v. City of Hartford,* 259 Conn. 729, 737 (2002).   In coming to that conclusion, the Connecticut Supreme Court explicitly distinguished Section 46a-60(a)(1) from 46a-60(a)(5), the aiding and abetting provisions of CFEPA, which expressly refer to "persons" in addition to "employers."  *Id.* at 737-38. Section 46a-60(a)(5) provides that it "shall be a discriminatory practice in violation of this section… [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so."  *Id.*  The Defendants acknowledge that recovery against a supervisory employee is cognizable under the aiding and abetting provision contained in Section 46a-60(a)(5), but argue that Turner does not allege that the Defendants aided or abetted each other. [Dkt. #10, Def. Mem.,p.13n.1].

Turner's complaint does allege that the Defendants' "discriminatory scheme also constituted a pattern or practice of discrimination attributable to EASCTOON, and the scheme was aided or abetted by Dyer, Cronin, Morin, Wapen and/or Cronin's conduct."  [Dkt. #1, Compl., ¶10].  Turner further argues that the numerous detailed allegations regarding each individual defendants' particular conduct supports her allegation of aiding and abetting.  [Dkt. #13, Pl. Mem., p. 13-14].  District courts in this circuit have "held that liability lies under this statute when a party in some way 'helps or compels' another individual, but not a company, to act in a discriminatory manner."  *Read v. Nationwide Mut. Ins. Co.*, No.3:06-cv-514(JCH), 2006 WL 2621652, at *3 (D. Conn. Sept. 13, 2006); *see also Wasik v. Stevens Lincoln-Mercury, Inc.,* No. 3:98-cv-1083 (DJS), 2000 WL 306048,

at *7 (D.Conn. March 20, 2000) (finding there was a cognizable claim for individual liability under Section 46a-60(a)(5) where other employees' actions "ratified, endorsed and perpetrated" another employee's unlawful conduct).

Turner has alleged that Dyer made anti-pregnancy comments to her and her allegations support the reasonable inference that Dyer was the moving force behind her being placed on FMLA leave.  [Dkt. #1, Compl., ¶¶23-24, 26].  Turner has also alleged that she complained to Morin about Dyer's treatment of her and that Morin told her that he would not do anything about Dyer.  Morin further told Turner that Colen was aware of the situation and approved of the treatment Turner had received.  *Id.* at ¶47. Tuner further alleges that she spoke with Wapen who informed her that she was going to be forced to take FMLA leave as Dyer had determined that there was non-classroom work available but no safe place in the classroom.  *Id.* at ¶31.  Turner's complaint also alleges that Cronin aided in abetted Dyer's unlawful conduct by falsely telling her that she could take as much time as she needed with her babies and return when she was able.  *Id.* at ¶31. Turner also alleges that Cronin suggested she obtain a third doctor's note permitting her to work in the classroom and that after she got the letter she was forced to take FMLA leave.  *Id.* at ¶41.  These allegations plausibly allege that Cronin ratified Dyer's decision or approved of Dyer's conduct towards Turner. At the motion to dismiss stage, the Court is required to accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010).  Based on these factual allegations, the Court draws the reasonable inference that Colen,

22

Morin, Cronin and Wapen ratified or endorsed Dyer's allegedly unlawful conduct to plausibly state an aiding or abetting claim under Section 46a-60(a)(5). In sum as there is no individual liability under Section 46a-60(a)(1), Turner's claims under this portion of CFEPA are dismissed as against all of the individual defendants. However, Turner's Section 46a-60(a)(5) aiding or abetting claims survive.

### III.   CTFMLA

Defendants argue Turner's CTFMLA claim must be dismissed because Eastconn is not a covered employer under Conn. Gen. Stat. §31-51kk, *et seq.* The CTFMLA defines an employer as:

> [A] person engaged in any activity, enterprise or business who employs seventy-five or more employees, and includes any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer and any successor in interest of an employer, but shall not include the state, a municipality, a local or regional board of education, or a private or parochial elementary or secondary school.

Conn. Gen. Stat. §31-51kk.

Defendants argue that the CTFMLA only applies to private not public employees and that Turner is essentially a public school teacher exempt from the CTFMLA. [Dkt. #10, Def. Mem., p.13-14]. Further, the Defendants argue that Eastconn should be covered under the carve out for employers under the CTFMLA's definition because RESCs are created by and controlled by local and regional boards of education and therefore should be considered a board of education for purposes of the CTFMLA. *Id.* at 15-16. In response, Turner argues that Eastconn does not fall within the carve-out because it identifies itself as a public, nonprofit agency, which is a regional education service center and not a school. [Dkt. #13, Pl. Mem., p. 15]. Turner further argues that Eastconn cannot be a board of

education itself because "in order to form a RESC four or more boards of education must submit a plan" and that any board of education may become a member of a RESC and withdraw from membership.  *Id.* at 16 (citing Conn. Gen. Stat. §10-66k).

The issue presented is one of statutory construction and first impression before the Court.  The Connecticut supreme Court recently rearticulated the standard of statutory construction.

> "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case.... When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case.... In seeking to determine that meaning ... [General Statutes] § 1–2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.... When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter.... We recognize that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise...."

*State v. Leak,* 297 Conn. 524, 532–33, (2010) (Internal quotation marks and citations omitted.); see *also State v. Webster*, 308 Conn. 43, 51-52 (2013) (same).

 "In construing a statute, we seek to ascertain and give effect to the apparent intent of the legislature.... [W]e are guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law...."

*Paige v. Town Plan & Zoning Commission,* 235 Conn. 448, 454-55 (1995); *Board of Education of the City of New Haven v. City of New Haven,* 237 Conn. 169, 180 (1996) (same).

In examination of the regional educational service center statutory framework and the CTFMLA reveal that a RESC is an instrumentality of local boards of education to which the legislature did not intend the CTFMLA to apply. A regional educational service center is a public educational authority acting on behalf of the state of Connecticut. Conn. Gen. Stat. § 10-66c. Regional educational service centers are authorized by state law to be "established by four or more boards of education for the purpose of cooperative action to furnish programs and services." Conn. Gen. Stat. § 10-66a. The General Assembly has directed the Department of Education to encourage the use of regional educational service centers as providers of goods and services for local and regional boards of education." Conn. Gen. Stat. § 10-66o. The Department of Education is also authorized to award special consideration to grant applications that indicate the use of services of regional educational service center. *Id.* "[T]he Commissioner of Education may allocate funds to allow regional educational service centers and state education organizations to provide professional development services, technical assistance and evaluation activities to local and regional boards of education, state charter schools, technical high schools, school readiness providers and other educational entities. Conn. Gen. Stat. § 10-66p. As both parties agree, RESCs are created by and controlled by local and regional boards of educations. The statute defines a RESC as "a body corporate

and politic," whose board is a "public educational authority acting on behalf of the State of Connecticut … for the purpose of cooperative action to furnish programs and services."  Conn. Gen. Stat. §10-66c(a).  Local and regional boards of education have the statutory duties to maintain "good public elementary and secondary schools, implement the educational interests of the state … and provide other educational activities in its judgment will best serve the interests of the school district."  Conn. Gen. Stat. §10-220(a).   Most relevant to the issue presented here is the statute which provides that:  "[a]ll state statutes concerning education … shall apply to the operation of regional educational service centers." Conn. Gen. Stat. § 10-66i.

Regional educational service centers are authorized for the express purposes of achieving synergies in the provision of educational services to students from its member local school systems. *See St. Ledger v. Area Co-op., Educ. Servs.*, 228 F.Supp.2d 66, 71 (D. Conn. 2002).   A RESC is a vehicle through which local boards of education can collaborate to achieve efficiencies of scale, to eliminate programmatic and staffing redundancies and further their collective educational mandate of providing quality education.  Concluding that a  RESC is not exempt from the CTFMLA would mean that only some state statutes concerning  education apply to the operation of regional educational service centers, which is contrary to the express language of Connecticut General Statute section 10-66i.   Such a reading is not only inconsistent with the letter of the law, it is inconsistent with the spirit of the law which is to maximize the value of state educational expenditures by encouraging local boards of education to

form regional bodies.  Subjecting regional bodies to requirements to which local boards of education are not subject would discourage regionalization, resulting in the opposite of what the legislature intended when it enacted the RESC act. Buttressing this conclusion is the broad language of the CTFMLA exemption, which encompasses all organizations providing direct educational services, including private schools.  The language of the legislation authorizing the creation of a RESC, its purpose, parentage, the express legislative mandate that all statutes applying to education apply to a RESC, and the broad exemption from the CTFMLA of educators, both public and private are indicative of a legislative intent that a RESC, like the boards of education which create it, are exempt from the CTFMLA.

IV.    State Personnel Act

Defendants argue that because Turner is not a state employee and her claim under the State Personnel Act, Conn. Gen. Stat. §5-248a, which pertains to family and medical leave requirements that apply to state employees, should be dismissed.  Turner argues that RESCs should be considered state agencies and therefore contends that she is a state employee based on a plain reading of the RESC statute.[3]   Tuner points to the statutory language that the "board of a regional educational service center shall be a public educational authority acting on behalf of the state of Connecticut" as support for her claim that Eastconn is a state agency.  Conn. Gen. Stat. §10-66c(a). She also points to a statutory

---

[3] **Turner acknowledges that if the Court finds that Eastconn is a state agency and that she is a state employee than the CTFMLA would not apply to her.**

provision, which provides that a RESC "shall be considered an agency of the state for purposes of subdivision (14) of subsection (d) of Section 42a-9-109." Conn. Gen. Stat. §10-66c(i).  Conn. Gen. Stat. §42a-9-109(d)(14) exempts state agencies from Article 9 of the UCC.

Another court in this district has persuasively held that RESCs are not state agencies.  *Bogle-Assegai v. Bigelow*, No.3:01cv2367(EBB), 2007 WL 3216393, at  *1 (D. Conn. Oct. 25, 2007).   In *Bogle*, the court utilized the factors the Connecticut Supreme Court employed, in *Gordon v. H.N.S. Management Co., Inc.*, 272 Conn. 81 (2004), to come to its conclusion that RESCs are not state agencies.  In *Gordon*, the Connecticut Supreme Court examined when a private entity could be considered an arm of the state to raise a sovereign immunity defense.  The Connecticut Supreme Court held that the criteria for determining whether a corporate entity is an arm of the state entitled to assert sovereign immunity as a defense are whether:

> (1) the state created the entity and expressed an intention in the enabling legislation that the entity be treated as a state agency; (2) the entity was created for a public purpose or to carry out a function integral to state government; (3) the entity is financially dependent on the state; (4) the entity's officers, directors or trustees are state functionaries; (5) the entity is operated by state employees; (6) the state has the right to control the entity; (7) the entity's budget, expenditures and appropriations are closely monitored by the state; and (8) a judgment against the entity would have the same effect as a judgment against the state…All relevant factors are to be considered cumulatively, with no single factor being essential or conclusive.

272 Conn. at 98-101.  Although the Connecticut Supreme Court examined whether a private management company that contracted with the state to operate public transportation services was an arm of the state, the Court finds that the use of

these factors to examine whether a RESC is an arm of the state is appropriate as the *Gordon* court drew from past precedent examining whether public benefits corporations governed by state law could be considered an arm of the state. *Id.* at 96 (citing *Dolnack v. Metro-North Commuter Railroad Co.*, 33 Conn. App. 832 (1994).  In addition, the *Gordon* Court also drew from the "criteria that this court has identified for determining whether a hybrid public-private entity is a public agency for purposes of subjecting it to General Statutes § 1–210, the Freedom of Information Act (FOIA)." *Id.* at 96.   The Court therefore finds that the *Gordon* factors are appropriately applied to a corporate body like a RESC to determine whether it is an arm of the state.

Applying the *Gordon* factors, the *Bogle* court concluded that a RESC is "a body corporate and politic created by local boards of education, not by the state. The members of RESC boards are selected by local boards of education.  The employees are RESCs are not state employees, and the state does not participate in the hiring or termination of RESC employees."  *Bogle*, 2007 3216393, at *1 (internal quotation marks and citations omitted).  In addition, "RESCs are not financially dependent on the state, as their primary source of funding for RESCs comes from the local districts by which they are formed, not the state. "  *Id.* (citing § 10-66e (stating that "the necessary administrative and overhead expenditures as determined by the board of the regional educational service center shall be shared jointly by the participating boards of education")).  Lastly, the *Bogle* court emphasized that  "although RESCs may issue bonds, the bonds 'shall not be obligations of the state of Connecticut or any municipality, and each

such bond, note or other obligation shall so state on its face.'" *Id.* (quoting § 10-66c(c)).  This Court agrees with the *Bogle*'s court's analysis that an examination of the entire structure of the RESC act does not support a conclusion that RESCs were intended to be construed as state agencies.   Although the boards of RESCs "act on behalf of the state of Connecticut" so do local or regional boards of education.  Statutorily each local or regional board of education is mandated to "implement the educational interests of the state."  Conn. Gen. Stat. §10-220.  The state does not have the authority to control the RESC.  Conn. Gen. Stat. §10-66b. Member boards may withdraw from the RESC as long as they fulfill their financial obligation to the purchasers of debt issued by the RESC during the time they were participants.  Conn. Gen. Stat. §10-66k.  Further, the RESC's budget, expenditures and appropriations are not closely monitored by the state; although the RESC must submit its budget  and its evaluation of programs and services annually to its constituent town boards of educations and the State Board of Education, the State shall not evaluate the RESCs more than once every five years. Conn. Gen. Stat. §§10-66g,h.

Turner also points to one District of Connecticut case and one Connecticut superior court decision in support of her proposition that a RESC is a state agency.  In *St. Ledger v. Area Co-op., Educ. Servs.*, 228 F.Supp.2d 66 (D. Conn. 2002), another court in this district held that for purposes of 42 U.S.C. §1983, a RESC was a state actor, which could be held liable for a First Amendment constitutional violation.  Turner's reliance on *St. Ledger* is misplaced as this case is distinguishable.  The *St. Ledger* court did not examine whether a RESC was a

state agency but simply held that a RESC's conduct could be considered state action subjecting a RESC to liability for constitutional torts. It is well-established that non-state employees such as local police officers and even employees of wholly private entities can be regarded as state actors for purposes of liability under 42 U.S.C. §1983. See *Fabrikant v. French*, 691 F.3d 193, 206-07 (2d Cir. 2012) ("[S]tate action requires both an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor. Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action.") (internal quotation marks and citations omitted). The state action requirement may be satisfied despite the fact that a wholly private or local governmental entity or officer was involved in the constitutional tort. However, that would not convert the wholly private or local governmental entity into a state agency with state employees.

Turner also points to the superior court's decision in *Sanchez v. Capital Regional Educ. Council*, No.CV000598554, 2001 WL 420475, at *2-3 (Conn. Super. Ct. April 6, 2001) in which it held that a RESC is s state actor shielded by sovereign immunity.[4] The *Sanchez* court concluded that a RESC is a state actor

---

[4] To the extent that Turner is relying on *Sanchez*'s holding that would mean that Eastconn would be entitled to the protection of sovereign immunity as an arm of the state which would result in the majority of her claims with the exception of her federal employment discrimination claims being barred by the Eleventh Amendment. *See 184 Windsor Ave., LLC v. State*, 274 Conn. 302, 309-10 (2005)

because its board is authorized to act on behalf of the State of Connecticut under the statute.  For the reasons discussed above, the Court is not persuaded this language in the statute should be construed to mean that a RESC is a state agency with state employees.  To the extent that this language is ambiguous as to whether a RESC is a state agency, any such ambiguity is overcome by the unambiguous statutory provision forbidding RESCs to issue bonds, which are the obligations of the State of Connecticut.

Lastly, the Plaintiff implies that a RESC may be considered a state agency with state employees for the limited purpose of the State Personnel Act because the statute provides that a RESC is a state agency for the limited purpose of exempted it from Article 9 of the UCC.  However absent an affirmative statutory provision expressly providing that a RESC is a state agency for such a limited purpose, there is no basis in the statute to assume that the State Personnel Act applies to a RESC.   For all the above reasons, the Court dismisses Tuner's State Personnel Act claim under Conn. Gen. Stat. §5-248a.

IV.    Contract and Tort Claims

Defendants argue that the Court lacks subject matter jurisdiction over all of Turner's contract and tort claims because she failed to exhaust the administrative

---

(holding that plaintiff could not bring breach of contract action against state absent authorization from the claims commissioner under Conn. Gen. Stat. §4-142); *Coger v. Connecticut*, 309 F.Supp.2d 274, 282 (D. Conn. 2004) (This court has previously held that, while plaintiff may bring a suit to redress violations of CFEPA in Connecticut State Superior Court, as provided in Conn. Gen.Stat. § 46a–99, that provision does not provide plaintiff with the right to sue the State of Connecticut in federal court."); *Hale v. Mann*, 219 F.3d 61, 69 (2d Cir. 2011) (holding that Congress did not have the authority to abrogate the sovereign immunity on claims arising under the relevant FMLA provision).

remedies provided in the CBA.  "'It is well settled under both federal and state law that, before resort to the courts is allowed, an employee must at least attempt to exhaust exclusive grievance and arbitration procedures, such as those contained in the collective bargaining agreement between the defendant and the plaintiffs' union.... Failure to exhaust the grievance procedures deprives the court of subject matter jurisdiction.'"  *Gerlach v. City of Danbury*, No. 3:09-cv-1950(JCH), 2012 WL 1032796, at *10 (D. Conn.  Mar. 27, 2012) (quoting *Saccardi v. Bd. of Educ. of the City of Stamford*, 45 Conn.App. 713, 715-16 (Conn. App. Ct. 1997)). The Connecticut Supreme Court has explained that the in the context of the collective bargaining agreement, "[t]he purpose of the exhaustion requirement is to encourage the use of grievance procedures, rather than the courts, for settling disputes.  A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it.... [I]t would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement.  A rule creating such a situation would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Labbe v. Pension Commission,* 229 Conn. 801, 811-12 (1994) (internal quotation marks and citations omitted).  Nevertheless, the Connecticut Supreme Court has "grudgingly carved several exceptions from the exhaustion doctrine ... including one where the administrative remedy is inadequate or futile." *Id.* at 812 (internal quotation marks and citations omitted).

Turner argues that she was not required to exhaust the CBA grievance procedures because of futility.  Turner contends that it would have been futile for her to challenge the Defendants' decision "with respect to the leave forced upon her too early and her requests to extend that leave so as not to be terminated." [Dkt. #13, Pl. Mem., p. 21].  She also argues that because her union did not get involved, "it is unreasonable to have expected Tuner to continue to seek their assistance and for the union to take a contrary position to its tacit approval of Defendant's conduct." *Id.* at 22.  Turner stresses that there is futility because her requests for assistance from the union went unheeded and that she attempted to get the help of "every available supervisor at every turning point in this matter" and each request was denied." *Id.*

The futility exception "is to be applied infrequently, and only for narrowly defined purposes." *Gerlach*, 2012 WL 1032796, at *11 (citing *Neiman v. Yale Univ.*, 270 Conn. 244, 258-59 (2004)).  "Courts have found that utilizing administrative procedures is not futile even where the decision maker has indicated that it will rule against the grievant, or where the likelihood of an adverse decision exists, so long as the possibility exists that the grievance procedures may provide the plaintiff with the desired relief." *Id.* (citation omitted).  "The mere possibility, or even likelihood, of an adverse decision does not render a remedy futile." *Neiman*, 270 Conn. at 260; *see also Sobczak v. Board of Educ. of City of Meriden*, 88 Conn.App.99, 107 (2005) ("the plaintiff's contention that it necessarily would be unavailing to file a grievance pursuant to levels one through three is purely speculative.").  Turner essentially argues that futility

exists because the supervisors she reached out to indicated that they would rule against her.  However, such a reason is not sufficient to establish futility particularly here where the CBA grievance procedures included binding arbitration before a neutral third party arbiter.  In particular, this provision for arbitration demonstrates that the grievance procedure may have provided Turner with her desired relief and therefore was not futile.

Turner's argument that the grievance procedure was futile and inadequate because her union failed to support her is likewise unpersuasive in view of the fact that the CBA did not require that the union bring the grievance but merely provided that a grievant *may* be represented by the union at any level of the grievance procedure.  [Dkt. # 10, Attachment A, CBA, Art 2.E.2] (emphasis added).[5]  The Connecticut appellate court argument rejected an identical argument finding a grievance procedure was not futile and inadequate where a union president refused to file a grievance as requested by the plaintiff because the "plaintiff remained free to pursue his grievance."  *Sobczak*, 88 Conn.App. at 107.  The *Sobczak* court concluded that the "plaintiff, therefore, was expressly permitted to initiate a grievance either on his own or with the assistance of a representative other than the union at levels one through three of the grievance

---

[5] **Notably had the CBA required the Union to initiate the grievance proceeding, Turner would have had to bring a claim against her union for breach of its duty of fair representation prior to seeking judicial review.  See** *Gerlach*, **2012 WL 1032796, at \*10 ( "Where a CBA specifies that the Union shall be the exclusive representative to bring a grievance to arbitration, an employee has no further remedy unless the employee can demonstrate that the Union breached its duty of fair representation by acting arbitrarily, maliciously, or in bad faith. An employee must bring such a claim against the Union before the board of labor relations prior to seeking judicial review from the courts.") (citations omitted).**

procedure. It is undisputed that he failed to do so." *Id.* As in *Sobczak*, Turner was permitted to initiative a grievance on her own with or without the assistance of her union and she has admittedly failed to do so.

Turner conclusorily states that the CBA grievance procedures would not have adequately protected her or provided her reasonable remedies.  [Dkt. #13, Pl. Mem., p.22].  However, Tuner fails to elucidate exactly why the CBA procedures were deficient or how the administrative remedies available under the grievance procedures would be inadequate.  It is well established that "Unions and their employers have broad contractual authority to provide administrative remedies for disputes arising out of the employment relationship. That authority encompasses issues of law as well as of fact." *Sobczak*, 88 Conn.App. at 105 (internal quotation marks and citations omitted).   It is further well established that "[t]he plaintiff's preference for a particular remedy does not determine the adequacy of that remedy. [A]n administrative remedy, in order to be adequate, need not comport with the [plaintiff's] opinion of what a perfect remedy would be." *BRT General Corp. v. Water Pollution Control Authority,* 265 Conn. 114, 12-24, (2003) (internal quotation marks and citations omitted). Here, Turner doesn't even identify what her perfect remedy would be and instead just states that the remedies are inadequate which is insufficient to excuse the exhaustion requirements.

Turner also argues that Cronin's promise that she could have time to be with her babies was intended to influence her into not raising any grievance or other administrative remedy.   [Dkt. #13, Pl. Mem. p. 22-23].  However, at the time

36

that Turner was informed that she was being terminated and thus learned that Cronin's alleged promise was not being fulfilled, she had the ability to initiate a grievance but failed to do so.

Lastly, Turner argues that she did in effect exhaust her administrative remedies by reaching out to the various supervisors to no luck prior to initiating CHRO proceedings.   This argument is flawed in several respects.   First, Turner's informal reaching out to various supervisors is not equivalent to the formal grievance procedures outlined in the CBA because those procedures call for formal written determinations and provide for appeal to the Board of Eastconn and then binding arbitration before a neutral third party arbiter.   Consequently, Turner's reaching out to Morin, Cronin, Wapen and Colen regarding her "grievance" was not equivalent to pursuing the grievance procedures outlined in the CBA.   Second, the CHRO process is not a grievance process, but rather a process which only had authority over Turner's allegations of employment discrimination in violation of federal and state employment discrimination laws and not over her contract or tort law based claims at issue. *See* Conn. Gen. Stat. §46a-56 (providing that the CHRO's duties include investigating the "possibilities of affording equal opportunity of profitable employment to all persons;" compiling "facts concerning discrimination in employment;" and investigating "all cases of discriminatory practices").   Therefore the fact that she proceeded before the CHRO is irrelevant with respect to her state law contract and tort claims.   For all the above reasons, the Court finds that it would not have been

futile or inadequate for Turner to have exhausted her administrative remedies under the CBA.

Turner argues that even if the Court does not find it was futile for her to exhaust her administrative remedies that not all of her claims are subject to dismissal as not all of her claims involve a violation of a specific term of the CBA such as her negligent supervision and her misrepresentation, fraud, and promissory estoppel claims premised on Cronin's alleged promise. [Dkt. #13, Pl. Mem. p. 13]. "In determining whether a tort claim is subject to the grievance procedures of a collective bargaining agreement, the critical inquiry, therefore, is whether the tortious conduct is encompassed by the terms of the agreement." *Sobczak,* 88 Conn.App. at 109. A "plaintiff may not choose [his] administrative remedy through the framing of [his] complaint. If that were possible, the purpose of the exhaustion doctrine would be thwarted." *Saccardi*, 45 Conn.App. at 718 (internal quotation marks and citations omitted).

Here, Turner's Counts 7 and 8 claims for breach of contract and breach of the covenant of good faith involve a term of the agreement and are therefore subject to the grievance procedures of the CBA. The Court therefore lacks subject matter jurisdiction over Counts 7 and 8 and dismisses them. With respect to Turner's Counts 9 and 10 claims for breach of oral contract, the Court finds that these claims are also subject to the grievance procedures. Turner argues that Cronin's oral promise that she could take as much time with her babies constituted an oral contract. Assuming that Cronin's  promise was an "oral contract," it would have to have been in effect an amendment to the CBA.

The authority to amend the CBA is governed by Article 34 and if the promise did so amend the CBA, the promise itself would be a term of the CBA and therefore subject to the grievance procedures and dismissal.  Further, it appears that Cronin's alleged "promise" reflects Cronin's interpretation of the CBA's provisions regarding pregnancy leave and therefore did not amend the CBA or create an entirely new oral contract.  As Cronin's "promise" reflected his understanding of the terms of the CBA such claims would be encompassed by the terms of the agreement and therefore subject to the grievance procedures. Moreover the CBA broadly provided that Eastconn held the sole and unquestioned right to direct its operation in all its aspects, which included its right to transfer, layoff, or discharge an employee, to control, supervise and manage the operations of EASTCONN and its professional staff as well as whether to grant pregnancy or any other kind of leave,.  [Dkt. # 10, Attachment A, CBA, Art. 1.B.6,7, and 13; Art. 13 and 15].  As Turner's Counts 9 and 10 claims are premised on Eastconn's conduct in failing to give Turner additional leave and their decision to terminate her in contravention of Cronin's oral statements it is clearly encompassed by the terms of the CBA.  The Court therefore lacks subject matter jurisdiction over Turner's Counts 9 and 10 and dismisses them.

Even if the Court had subject matter jurisdiction over Turner's Counts 9 and 10 claims, the Court would dismiss those counts for failure to state a claim. Plaintiffs' allegations that Cronin's oral promise constituted an oral contract are not plausible. First, a contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties.  "In

order to support contractual liability, the defendants' representations must be sufficiently definite to manifest a present intention on the part of the defendants to undertake immediate contractual obligations to the plaintiff." *Burnham v. Karl and Gelb, P.C.,* 50 Conn.App. 385, 389 (1998) (internal quotation marks and citations omitted).  Turner fails to plead facts to show that Cronin had authority to amend the CBA or that his promise was sufficiently definite to manifest an intention on the part of Eastconn to undertake the immediate contractual obligation to allow Cronin to take any amount of time she requested.

For similar reasons, Turner's Count 11 claim for promissory estoppel based on Cronin's alleged promise is dismissed.   As discussed above, Cronin's "promise" appears to relate to his understanding of the CBA's provision for pregnancy leave and therefore Turner's promissory estoppel claim is encompassed by the terms of the agreement.  Further, this claim is also encompassed by the terms of the CBA, which provided Eastconn the sole right to direct its operations including terminating employees and granting leave. Turner's claim that Eastconn should be estopped from refusing her leave and terminating her because Cronin promised her as much time as she needed is incident to Eastconn's right to run its operations, grant leave, and terminate an employee as provided in the CBA.  The Court therefore lacks subject matter jurisdiction over Turner's Count 11 claim and dismisses it.

Likewise Turner's Counts 14, 15, and 16 for negligent supervision are encompassed by the terms of the CBA.  The CBA provided that Eastconn had the right, responsibility and prerogative to direct its operations including "[i]n

general, to control, supervise, manage the operations of EASTCONN and its professional staff." [Dkt. # 10, Attachment A, CBA, Art. 1.B.13].  Turner's claims for negligent supervision fall squarely within this term of the CBA and are likewise subject to the grievance procedure.  The Court therefore lacks subject matter jurisdiction over Turner's Counts 14, 15, and 16 claims and dismisses them.

Lastly, Turner's Count 17 and 18 claims for negligent and intentional infliction of emotional distress are also encompassed by the terms of the CBA as her emotional distress claims are predicated on Defendants' conduct when they denied her additional leave, allegedly failed to provide her with accommodations, and terminated her.   As discussed above the CBA provided that Eastconn had the right to "control, supervise and manage the operations of EASTCONN and its professional staff under governing laws" including its right to "… [t]o discharge or otherwise discipline any employee" and "[t]o promote, transfer, and lay off employees.  ." [Dkt. # 10, Attachment A, CBA, Art. 1.B].  The tortious conduct that underlies her negligent and intentional infliction of emotional distress claims is clearly encompassed by these terms of the CBA.   See *Peluso v. Town of Greenwich*, No.FSTCV226011270S, 2012 WL 6846546, at *9 (Conn. Super. Ct. Dec. 14, 2012) (holding that emotional distress claim subject to exhaustion requirement as the tortious conduct fit the definition of a grievance as relating to conditions of employment and noting that the "fact that the plaintiff has couched his various complaints as common-law tort claims does not change this result.")

As the Court lacks subject matter jurisdiction over Turner's Counts 17 and 18 claim, such claims are dismissed.


### Conclusion

Based upon the above reasoning, Defendants' [Dkt. #10] motion to dismiss is DENIED IN PART and GRANTED IN PART.   The Court dismisses Plaintiff's Title VII and CFEPA claims based on familial status and gender apart from pregnancy; her CTFMLA claim under Conn. Gen. Stat. §31-51kk ; her Title VII and general CFEPA claims under Conn. Gen. Stat. §46a-60(a)(1) against all the individual defendants; her State Personnel Act claim, and her contract and tort law claims in Counts 7-18.  The rest of Plaintiff's claims remain extant for summary judgment and trial.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 15, 2013