## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT


| | | |
|---|---|---|
| **REBECCA A. TURNER,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.** |
| | : | **3:12-CV-00788 (VLB)** |
| **v.** | : | |
| | : | |
| **EASTCONN REGIONAL EDUCATION** | : | |
| **SERVICE CENTER; PAULA COLEN;** | : | |
| **STEVEN WAPEN; DORIS DYER;** | : | **December  2, 2013** |
| **THOMAS CRONIN; and RONALD MORIN,** | : | |
| **Defendants.** | : | |


### MEMORANDUM OF DECISION GRANTING IN PART DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT [Dkt. #29]


### I.      Introduction

The Plaintiff, Rebecca Turner, brings this action against Defendants,

EASTCONN Regional Education Service Center ("EASTCONN"), Paula Colen,

Steven Wapen, Doris Dyer, Thomas Cronin, and Ronald Morin alleging various

violations related to alleged employment discrimination.  Defendants have moved

for summary judgment pursuant to Fed. R. Civ. P. 12(b)(1), lack of subject matter

jurisdiction, and 12(b)(6), failure to state a claim upon which relief may be granted

with respect to several counts in the Complaint, including: Count I, violations of

Connecticut Fair Employment Practices Act ("CFEPA"); Count II, violations of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.,

("Title VII") and the Civil Rights Act of 1991, as amended by the Pregnancy

Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"); Count V, violations of the

1

Family Medical Leave Act, 42 U.S.C. § 2611, *et seq.* ("FMLA"); and Count VI, violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").  For the following reasons, Defendants' motion for summary judgment is GRANTED as to the claims arising from federal statutes and all other claims are DISMISSED without prejudice to proceeding in state court.

## II.    Background

EASTCONN is a regional educational service center established in accordance with Connecticut state law.  *See* Conn. Gen. Stat. § 10-66a.  The other defendants at all relevant times were employees of EASTCONN, holding various supervisory positions over the plaintiff:  Colen is and was the Executive Director, Wapen is and was the Director of Human Resources, Dyer is and was the Autism Clinical Director or Director of Autism and Clinical Services, Cronin is and was the Director of Education Services, and Morin is and was the Director of Special Services.  [Dkt. #29-2, Defendant's 56(a)(1) Statement, ¶¶ 2-6].

The plaintiff began her employment with EASTCONN on November 4, 2008 as an instructional assistant, and on April 8, 2009, she was hired as a long-term substitute in EASTCONN's Autism Program, a program that serves children with autism spectrum disorders and other developmental impairments.  [*Id.* at ¶ 8].  Shortly thereafter, on July 6, 2009, she was hired to work as a full-time teacher in the Autism Program.  [*Id.*].

For the 2009-2010 academic year, the plaintiff held dual teaching certifications form the State Department of Education: pre-kindergarten through kindergarten special education instruction and pre-kindergarten through third-grade regular

2

education instruction.  [*Id.* at ¶ 9, Dkt. #29-11, Deposition of Rebecca Turner, 55:19-25].  Shortly after she was hired as a full-time teacher, the plaintiff joined the EASTCONN Federation of Teachers – the local union responsible for representing members of the teachers' bargaining unit at EASTCONN.  [Dkt. #29-2, ¶ 10; #29-11, 56:1-6].  Even though the plaintiff was hired as a full-time teacher, she never became a tenured teacher and, therefore, never received the benefits that a tenured position provides.  [Dkt. #29-2, ¶ 10(b)].

For the 2009-2010 school year, the Autism Program serviced three students ranging in age from seven to nine or ten.  [Dkt. #29-11, 51:20-25].  The students were at different points on the autism spectrum, but all generally exhibited aggressive behavior at various times.  [*Id.* at 53:1-14].  During that year, the students were taught by two special education teachers, one of whom was the plaintiff, and assisted by two paraprofessionals.  [*Id.* at 45:5-15].  Generally, each classroom in the autism program had one lead teacher responsible for critical administrative duties and case management tasks; the lead teacher also did not provide direct, one on one instruction, but gave group instruction to the entire class.  [Dkt. #30-11, II ¶¶ 2-3; Dkt. #29-11, 152:5-21].  The other teachers and/or paraprofessionals were required to provide one on one instruction to the students.  [Dkt. #30-11, II ¶¶ 2-3].  Teachers were required to respond to students who were often upset and reactive. [Dkt. # 30-4, EASTCONN Annual Appraisal Report, p. 4].

As a regular full-time teacher not designated as the lead teacher, two-thirds of the plaintiff's time was spent providing direct instruction to students in the

3

classroom while the remaining third was spent on administrative tasks such as lesson planning, evaluations and assessments.  [*Id.* at 49:9-12, 84:3-9].  During the course of this instruction, teachers, including the plaintiff, were often, even sometimes daily, called upon to restrain students who had become aggressive. [*Id.* at 52:15-24].  Restraining the students posed physical risks; the plaintiff admitted that she was injured while restraining a student, but the extent of the injuries suffered thus far were admittedly minor, including just a "scratch."  [*Id.* at 53:5-15].

While serving as a full-time teacher, the plaintiff became pregnant with twins due on December 26, 2010, but ultimately delivered on November 24, 2010.  [Dkt. #1, Complaint, ¶ 9].  In April 2010, the plaintiff notified Dyer, her immediate supervisor, of her pregnancy.  [Dkt. #29-11, 62:9-13].  Furthermore, on April 26, 2010, the plaintiff submitted a doctor's note to Dyer stating "[t]his is to confirm that the [plaintiff] is under my care and currently receiving treatment.  Please excuse her from restraining activities until further notice."  [Dkt. #29-9, Doctor's Note dated April 7, 2010, p. 1].  As a result of this notice, the plaintiff was not required to restrain students for the duration of her pregnancy.  [Dkt. #29-11, 65:1-5].  The plaintiff also alleges that she began to notice Dyer treating her differently after submitting this note.  For example, the plaintiff stated that when she gave this first note, Dyer asked if she "could even work?"  [Dkt. #29-2, ¶ 65]. Subsequently, the plaintiff alleged that Dyer remarked that the plaintiff did not "even look pregnant," and Dyer peaked into the plaintiff's classroom windows while the plaintiff was on her lunch break making personal phone calls.  [*Id.*].

4

Even so, on May 28, 2010, at the conclusion of the 2009-2010 academic year, the plaintiff received positive feedback from Dyer in her annual evaluation. Specifically, Dyer noted that the plaintiff "is to be commended in several areas. She is perceptive and brings an attention to details [sic] to discussions and planning that is helpful.  Her calm manner is beneficial in a classroom that often needs to respond to students who are upset and reactive.  And she is a supportive and encouraging team member."  [Dkt. # 30-4, EASTCONN Annual Appraisal Report, p. 4].

Following the conclusion of the academic year, the plaintiff worked in EASTCONN's academic summer program as a lead teacher and was in charge of the summer program.  [Dkt. #29-11, 65:23-67:23].  After the summer program ended, the plaintiff returned to her position as a regular teacher in the autism program, and Ms. Buchanan was designated as her lead teacher for the 2010-2011 year.  [Dkt. #29-2, ¶ 48].  On September 8, 2010, the plaintiff submitted a second doctor's note to Dyer that stated "Rebecca Turner is pregnant with twins due 12/26/2010 and should not be working closely with children who can become aggressive." [Dkt. #1, ¶ 23; Dkt. #29-9, Doctor's Note dated September 7, 2010, p. 2].  On September 9, 2010, Dyer told the plaintiff that EASTCONN's Human Resources' personnel were discussing the situation, and on September 9 and 10, EASTCONN temporarily accommodated the plaintiff's condition by assigning her exclusively administrative tasks.  [[Dkt. #1, ¶¶ 27, 28].

Dyer next met with the plaintiff on September 13 to inform the plaintiff that she would be required to take FMLA leave starting on September 27 because

5

EASTCONN was only able to accommodate the plaintiff's new restriction for two weeks.  [*Id.* at ¶ 29].

On September 14, the plaintiff spoke with Wapen who told her that he understood there was "non-classroom" work available, but that the amount was miniscule, and there was no safe place in the classroom for her to work given the students' propensity for aggressive behavior.  [Dkt. #29-11, 91:16-92:5; Dkt. #30-10, Deposition of Steven G. Wapen, 90:20-91:7].  On September 15, the plaintiff contacted the union regarding the pregnancy-related employment issues at EASTCONN, but neither the plaintiff nor the union filed a grievance pursuant to the collective bargaining agreement entered into between EASTCONN and the union.  [Dkt. #29-11, 95:9-13, 103:4-7; Dkt. #1, ¶ 34].  Moreover, the union representative told the plaintiff that it was her understanding that if the plaintiff could not perform essential functions of her employment and there was no other position available at EASTCONN, she would need to take FMLA-designated leave. [Dkt. #29-11, 97:2-23].

Between September 20 and October 1, 2010, the plaintiff discussed with Dyer and Cronin her concerns about not having sufficient FMLA leave after the delivery of her children if she was forced to take leave starting at the end of September.  [Dkt. 29-2, ¶¶ 41-44; Dkt. #30-11, II ¶ 6].  The plaintiff alleged that when meeting with Cronin, she asked for the possibility of obtaining additional FMLA leave once the twelve weeks expired, but he said that her request would be denied.  [Dkt. #29-11, 102:12-24].  Cronin further advised the plaintiff to obtain a new doctor's note stating that the plaintiff would be allowed to continue working

6

until her projected due date.  [Dkt. #1, ¶ 41; Dkt. #29-2, ¶ 44].  Accordingly, on September 27, the date she was supposed to start FMLA leave, the plaintiff submitted a third doctor's note which stated that the plaintiff could "perform all of her job responsibilities with the exception of having one on one contact with aggressive children."  [Dkt. #1, ¶ 42, Dkt. #29-2, ¶ 45].  The plaintiff was not aware of any other suitable open positions at EASTCONN at that time, but alleges that she should have been permitted to replace Ms. Buchanan as lead teacher until her delivery or should have been assigned administrative duties until such time as she could resume direct instruction with the students.  [Dkt. #30-10, ¶¶ 8, 9, 17; Dkt. #29-11, 111:11-25; Dkt. #30-11, ¶ 8].

EASTCONN permitted the plaintiff to continue working until October 1, 2010 while it examined and considered the plaintiff's third doctor's note.  [Dkt. #29-11, 109:10-18].  On October 1, 2010, it was determined that the third note did not alter the underlying issue created by the second note, namely that the plaintiff was not permitted to perform an essential function of her employment: providing direct instruction to the autistic students.  Therefore, she was required to take FMLA leave starting on October 4, 2010.  [*Id.*].

During her FMLA leave, the plaintiff concurrently used her accrued paid sick leave and personal leave time until such leave was exhausted.  [*Id.* at 114:2-17; Dkt. #29-2, ¶ 53].  The plaintiff was freely given the entirety of her twelve weeks of FMLA leave which began on October 4, 2001 and ended on January 4, 2011.  [Dkt. #29-11, 137:15-17, 109:14-18; Dkt. #29-2, ¶¶ 55-56].

7

On December 30, 2010, Wapen called the plaintiff and informed her that her FMLA leave was coming to an end, and that if she did not return to work on January 5, 2011, she would be terminated.  [Dkt. #29-11, 123:8-22; Dkt. #29-2, ¶ 59].  At that time, the plaintiff indicated that she was unable to return to work on January 5 because her children's premature births caused health issues that required her attention, and she was unable to provide to Wapen a date by which she would be able to return.  [Dkt. #29-11, 125:13-19; Dkt. #1, ¶ 49; Dkt. #29-29-2, ¶¶ 59-60; Dkt. #30-11, I ¶ 60(a)].  The plaintiff also alleges that on that call she requested additional leave from Wapen, but that he denied her request.  [Dkt. #30-11, II ¶ 6].  Accordingly, the plaintiff was terminated by EASTCONN on January 5, 2011 and has not since applied for any open positions at EASTCONN.  [Dkt. #29-2, ¶ 61; Dkt. #30-11, I ¶ 61].

The plaintiff filed this action alleging violations of numerous state and federal employment and disability protection statutes.  In bringing these claims, she summarily alleged that another pregnant EASTCONN employee, Allyson Carter, received accommodations that the plaintiff herself did not receive.  [Dkt. #29-11, 126:4-12; Dkt. #29-2, ¶ 62].  The defendants allege, however, that Ms. Carter received the same accommodations as the plaintiff, namely that they were both excused from restraining students.  [Dkt. #29-2, ¶ 63].  The defendants also allege that other EASTCONN employees have been terminated after their failure to return to work when their FMLA leave expired, including another teacher, Ms. Jacobs, and a driver, Ms. Easton.  [Dkt. #29-2, ¶ 66; Dkt. #30-7, ¶ 21].

### III.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011

**9**

WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

### A.  ADA Claims

The plaintiff alleges that "as a result of the restrictions placed on her by her physician(s), [she] was actually impaired or disabled or perceived as" disabled by the defendants.  [Dkt. #1, ¶ 60].  The plaintiff further argues that the defendants discriminated against her because of her disability by not accommodating her during the pendency of her pregnancy.  [Dkt. #29-11, 102:2-5, 108:1-14; Dkt. #30-11, II ¶ 2].  The defendants argue they should be awarded summary judgment on these claims because: (1) the plaintiff was not disabled under the ADA; (2) the defendants did not perceive her as disabled; (3) even if the defendants perceived her as being disabled, "regarded as" ADA claims are not subject to the reasonable accommodation requirement; (4) the plaintiff's disability did not impair a major life activity; and (5) the defendants did not fail to provide reasonable accommodation.  [Dkt. #29-1, Memorandum of Law in Support of Defendants' Motion for Summary Judgment, p. 4-18].  In response, the plaintiff only argues that she was perceived as being disabled by the defendants because of the way they treated her and was discriminated against because the

10

defendants did not permit her to work until her due date.  [Dkt. #30, Memorandum of Law in Opposition to Motion for Summary Judgment, p. 5-11].

From the complaint, it appears that the plaintiff is alleging discrimination based both on adverse employment action and failure to accommodate.  The Court will examine both of these standards, therefore, in turn.

### i.    Discrimination Based on Failure to Accommodate

A plaintiff presents a prima facie case of disability discrimination arising from a failure to accommodate by showing: "(1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96-7 (2d Cir. 2009) (internal quotation marks and citations omitted). Defendants do not contest that they are covered by the ADA and had notice that the plaintiff was pregnant.  So, the second factor is not contested.

First, the plaintiff must demonstrate that she was disabled within the meaning of the ADA.  As this claim arises after January 1, 2009, the ADA Amendment Act of 2008 ("ADAAA") governs the analysis. It is clear that the ADAAA "substantially broadened the definition of a disability" in response to Supreme Court decisions that strictly defined the term "disability" under the ADA.  *See Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 210 (D. Conn. 2012) (quoting *Hutchinson v. Ecolab, Inc.*, No. 3:09cv1848(JBA), 2011 WL 4542957, at *7 (D. Conn. Sept. 28, 2011)).  "Disability" is defined as "(A) a physical or mental

11

impairment that substantially limits one or more major life activities of such individuals; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The ADAAA enlarged the interpretation of the ADA's three-category definition of "disability."  For example, "'major life activity' [under the first definition of disability now] includes 'caring for oneself, performing manual tasks . . . walking, standing, lifting, bending, speaking, breathing, . . . and working,' as well as 'the operation of a major bodily function,' including 'neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.'"  *Wanamaker*, 899 F. Supp. 2d at 210 (*quoting Hutchinson*, 2011 WL 4542957, at *8)).

Equal Employment Opportunity Commission ("EEOC") regulations implementing the ADAAA, although having no binding effect on this Court, are "useful to understanding the intended meaning of the Amendments." *Wanamaker*, 899 F. Supp. 2d at 210 (internal quotation marks and citations omitted).  The EEOC regulations provide that under the ADAAA, an impairment is a disability within the meaning of the statute where "it substantially limited the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  The regulations further clarified that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  29 C.F.R. § 1630.2(j)(1)(vi).  Accordingly, "temporary, non-chronic impairments of short-

12

duration, with little or no longer term or permanent impact, are usually not disabilities." *Wanamaker*, 899 F. Supp. 2d. at 211 (internal quotation marks and citations omitted); *see also Green v. N.Y. City Health & Hosp. Corp.,* No. 04cv5144(PAC), 2008 WL 144828, at *4 (S.D.N.Y. Jan. 15, 2008) ("To establish a disability under the ADA, there must be some proof of permanency.")  Even after the ADAAA, this Court has held that short-term impairments do not

> render a person disabled within the meaning of the statute.  EEOC interpretive guidance explains that the "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section" however "[t]he duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity.  Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe."

*Wanamaker*, 899 F. Supp. 2d at 211 (quoting 29 C.F.R. pt. 1630, App.)

Given these parameters, "[p]regnancy does not typically constitute a disability under the ADA."  *Wanamaker*, 899 F. Supp. 2d at 211 (quoting *Sam-Sekur v. Whitmore Group, Ltd.*, No. 11-cv-4938(JFB)(GRB), 2012 WL 2244325, at *7-8 (E.D.N.Y. June 15, 2012) (collecting cases); *see also Kucharski v. Cort Furniture Rental*, 536 F. Supp. 2d 196, 202 (D. Conn. 2007), *rev'd on other grounds on reconsideration*, 594 F. Supp. 2d 207 (D. Conn. 2008), *aff'd*, 342 F. App'x 712 (2d Cir. 2009) ("Courts have proved reluctant to afford ADA protection to alleged disabilities related to pregnancy except in extremely rare cases where the complication from the pregnancy is substantial enough to qualify as a disability").

13

Here, the plaintiff alleges that she is disabled because she was pregnant. However, the plaintiff has not alleged that there were severe complications caused by the pregnancy that would render her disabled under the ADA. Conversely, she admitted that she had no pregnancy-related complications when she was pregnant with her twins.  [Dkt. #29-11, 115:5-8].  It appears, although it is difficult to be certain because the plaintiff did not respond to this point in her opposition to the motion for summary judgment, that the plaintiff relies on the claim that the doctor's notes substantially limited her major life activity of working, thus bringing her pregnancy into the ambit of the statutory definition of disability.  *See McDonald v. City of New York*, 786 F. Supp. 2d 588, 606 (E.D.N.Y. 2011) ("Notably, not every physical or mental impairment serves to establish an actual disability under the ADA.  Rather, only those impairments that 'limit a major life activity' in a 'substantial' manner are statutorily recognized disabilities.'" (citations omitted)).

In order to be substantially limited in the major life activity of "working," the plaintiff is required to show that "she was precluded from more than one type of job, a specialized job, or a particular job of choice." *Reynolds v. Town of Suffield*, No. 3:10cv1528(JBA), 2012 WL 3135896, at *7 (D. Conn. July 31, 2012) (citing *Pare v. City of Bristol*, 386 F. Supp. 2d 43, 39 (D. Conn. 2005)); *see also*, *Cardo v. Arlington Cent. School Dist.*, 473 F. Appx. 21, 24 (2d Cir. 2012) (finding that a plaintiff failed to prove a substantial limitation on working when a doctor's note prevented him from performing "his particular" job).  "In the rare cases where an individual has a need to demonstrate that an impairment substantially limited him

**14**

or her in working, the individual can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities."  29 C.F.R. Pt. 1630, App.

Here, the plaintiff's first doctor's note prohibited her from restraining students who had become aggressive.  By the third note, she was prohibited from working one on one with aggressive students.  [Dkt. #29-9, Doctor's Note dated September 24, 2010, p. 3].  Clearly, these notes do not severely limit the plaintiff from working generally, as would a note that, for example, required the plaintiff to remain bed-ridden for the duration of her pregnancy.  Instead, these letters only prevented the plaintiff from giving direct instruction to students in the autism program.  The plaintiff argues that her impairment actually prohibited her from working in a broad class of jobs because the defendants, employing over 500 people in various positions, conceded "that they found no suitable jobs at EASTCONN that Plaintiff could have performed while pregnant."  [Dkt. # 30, p. 9-10].  This is an inaccurate characterization of the defendants' testimony. Defendants stated that there were no "available suitable" positions in the organization at that time.  [Dkt. #29-4. Affidavit of Steven Wapen, ¶ 17].  The key here is the plaintiff's admission that there were positions at EASTCONN for which she could perform all of the necessary functions.  She concedes, therefore, that she was able to work, just not in her particular job.  Moreover, the defendants' testimony was not that they were unable to find her a position, but that they were unable to find her a vacant position, and the plaintiff has offered no evidence

**15**

proving such vacancies existed.  Therefore, this Court views unavailing the claim that since EASTCONN was unable to find an open position for her at that time, the plaintiff sufficiently demonstrated an impairment on "working."  Given that the plaintiff has not presented any evidence showing that her pregnancy was of such a complicated nature to permit the Court to stray from the accepted holding that pregnancies are not disabilities under the ADA and the fact that the plaintiff has not demonstrated how her impairment limited a major life activity, no reasonable trier of fact could find that the plaintiff has a disability as defined in the ADA.

Second, for a prima facie claim of employment discrimination based on a failure to accommodate under the ADA, the plaintiff must prove that with reasonable accommodation, she could have performed the essential functions of her job.  A "reasonable accommodation can never involve the elimination of an essential function of a job," and "[i]n approaching this inquiry, [a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position."  *Shannon v. New York City Transit Auth.*, 32 F.3d 95, 100 (2d Cir. 2003); *Palmieri v. City of Hartford*, No. 3:11cv149(JCH), 2013 WL 2398365, at *11 (D. Conn. May 31, 2013).  "In the context of the ADA, reasonable accommodation may include, *inter alia*, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, reassignment to a vacant position."  *McBride*, 583 F.3d at 97 (internal quotation marks and citations omitted).

16

Here, the plaintiff stated that roughly two-thirds of her time was spent providing direct instruction to autism program students who have a tendency to become aggressive.  [Dkt. #29-11, 102:2-5].  Giving due deference to the defendants' determination that this task comprised an essential aspect of the plaintiff's job, providing an accommodation that would preclude the plaintiff from performing this instruction would eliminate an essential job function, and, therefore, by definition is not reasonable.

The plaintiff contends that there were other reasonable accommodation options: she could perform administrative tasks, be assigned to instruct less aggressive children, or take the place of the current lead teacher until she was no longer pregnant.  [Dkt. #30-11, II ¶ 2].  As to the first option, EASTCONN determined that assigning the plaintiff to administrative tasks was not reasonable because there was not a sufficient amount of administrative work to keep a full-time employee occupied.  As to the second option, the plaintiff has offered no evidence that there were less aggressive students in the program to whom she could have been reassigned.  Nor would such an accommodation appear to have been appropriate.  Her doctor's notes were not qualitative; they unequivocally prohibited her from working with all children who could become aggressive.  As to the third option, it is not reasonable to move multiple employees to different positions to accommodate one disabled employee.  Indeed, it is clear that only in *certain circumstances* is it even reasonable to move an employee to a vacant position.  *See McBride*, 583 F.3d at 97 (internal quotation marks and citations omitted).  In *Medlin v. Rome Strip Steel Co., Inc.*, the court granted summary

judgment when an employee with back related injuries failed to prove reasonable accommodation was available because he did not provide any evidence that another  position was "vacant" and had "terms and conditions of employment equivalent to that of his prior job."  294 F. Supp. 2d 279, 291 (N.D.N.Y. 2003).  The plaintiff here has not offered any evidence that a vacant position existed; instead, she would have the defendants permit her to "temporarily adopt the role of lead teacher," by removing Ms. Buchanan from that position.  [Dkt. #30-11, II ¶ 2].  To affect another employee in this way is not reasonable.  Accordingly, the plaintiff has not met her burden in showing that reasonable accommodation exited.

For these reasons, the plaintiff has failed to demonstrate a possibility of success on her ADA claim based on failure to accommodate.

ii.    Discrimination Based on Adverse Employment Action

To establish a prima facie case of discrimination arising from adverse employment action, a plaintiff must show "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability."  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008); *see also Wanamaker*, 899 F. Supp. 2d at 209.  Again, the defendants do not allege that they are not subject to the ADA, so that element is conceded.

First, as discussed above, the plaintiff is not actually disabled within the meaning of the ADA.  Moreover, the plaintiff has not raised a sufficient issue of

**18**

material fact as to whether the defendants perceived her as being disabled because her pregnancy was transitory, not permanent.  In the prior version of the statute, the definition of perceived disability included only those physical or mental impairments that were perceived to substantially limit a major life activity. After January 1, 2009, a plaintiff is no longer required to show that the alleged physical or mental impairment is perceived to substantially limit a major life activity, but even "perceived as" claims cannot be based on an impairment that is known to be "transitory and minor."  42 U.S.C. § 12102(3)(B).  "A transitory impairment is an impairment with an actual or expected duration of 6 months or less."  *Id.*  In *Sam-Sekur v. Whitmore Group, Ltd.*, the court held that a plaintiff alleging a violation of the ADA based on pregnancy failed to sustain a motion to dismiss because pregnancy without any other complications is not by itself an impairment under the statute.  *Sam-Sekur*, 2012 WL 2244325, at *8; *see also Marchioli v. Garland Co., Inc.*, No. 5:11-cv-124(MAD/ATB), 2011 WL 1983350, at *6 (N.D.N.Y. May 20, 2011) (pregnancy is not a physical impairment under the ADA so no "regarded as" claim can survive).

The case law makes clear that pregnancy without allegations of mental or physical complications therefrom is insufficient for a claim of ADA discrimination.  Moreover, even if the plaintiff has shown that the defendants perceived her as suffering from some impairment that inhibited her ability to perform essential functions of her job, she has not alleged any facts showing that the defendants perceived her pregnancy as being permanent.  The defendants became aware that the plaintiff was pregnant in April 2010 when she submitted

her first doctor's note and told Dyer that she was expecting.  At that point, her condition was accommodated by removing from her responsibilities restraining students.  Five months later, she submitted her second doctor's note which prohibited her from working closely with children who can become aggressive.  At this point it is reasonable to assume that the defendants believed the plaintiff's impairment, if any, would only remain for at most four more months because she was then at least five months pregnant.  This duration is by definition "transitory."  42 U.S.C. § 12102(3)(B).   Finally, Plaintiff failed to return to work not because she was physically unable to do so, but rather because her children had continuing medical needs.

Given the temporal nature of her disability and her stated reason for failing to return to work, the plaintiff has not raised a genuine issue of fact that the defendants perceived her as having a disability that was anything but transitory.  Regardless, assuming that the defendants did perceive the plaintiff as having a sufficient disability under the ADA, as discussed above, there were no reasonable accommodations that could have been made to allow the plaintiff to continue to perform her job.  Therefore, the plaintiff's ADA claims must fail.

### iii.    Individual Liability under the ADA

The plaintiff also brought ADA claims against each of the individual defendants.  The defendants argue that these claims must be dismissed as a matter of law because the ADA does not establish individual liability.  In response, rather than withdrawing a claim for which there is no legal support, the

**20**

plaintiff, without so much as a rational argument why the Court should not follow precedent, said it would leave this issue to the Court.

Even though the Second Circuit has not issued a published opinion holding that the ADA does not permit recovery against individual defendants, it has so held in an unpublished opinion.  In *Corr v. MTA Long Island Bus*, the Second Circuit found that "there is no right of recovery against individual defendants under the ADA."  199 F.3d 1321 (2d Cir. 1999) (unpublished decision), relying on *Tomka v. Seiler Corp.*, 6 F.3d 1295, 1314 (2d Cir. 1995) (holding that Title VII does not permit recovery against individual defendants because the use of the word "employer" would otherwise lead to results not contemplated by Congress.") Most courts in this circuit have similarly held that the ADA does not permit recovery against individual defendants.  *See Thomas v. New York City Dept. of Educ.*, 938 F. Supp. 2d 334, 354-55 (E.D.N.Y. 2013); *McAllister v. Connecticut Renaissance Inc.*, 3:10cv1488(WWE), 2011 WL 1299830, at *1 (D. Conn. 2011); *Kennedy v. St. Francis Hosp.*, 225 F. Supp. 2d 128, 144 (D. Conn. 2002); *Nelson v. City of New York*, No. 11 Civ. 2732(JPO), 2013 WL 4437224, at *14 (S.D.N.Y. Aug. 19, 2013) ("It is well established that there is no individual liability under the ADA or the Rehabilitation Act.").  Given the weight of authority in this Circuit, this Court holds that the ADA does not provide for recovery against individual defendants, and dismisses the plaintiff's ADA claims against defendants Colen, Wapen, Dyer, Cronin, and Morin.

For the foregoing reasons, defendants' summary judgment motion on the plaintiff's ADA claims is GRANTED.

21

**B.  Title VII Claims**

The plaintiff next brings claims for discrimination on the basis of her pregnancy, in violation of Title VII as amended by the PDA.

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Congress enacted the PDA in 1978 to clarify that "for all Title VII purposes, discrimination based on a women's pregnancy is, on its face, discrimination because of her sex." *Auto. Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).  The ultimate goal of the PDA was to ensure that pregnant employees are treated identically as other temporarily disabled employees. *See Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 126 (E.D.N.Y. 2011).  "Unless the employee on leave has informed the employer that she does not intend to return to work, her job must be held open for her return on the same basis as jobs are held open for employees on sick or disability leave for other reasons." 29 C.F.R. Pt. 1604, App. The plaintiff always bears the burden of proving unlawful discrimination because of pregnancy in PDA cases. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Gallo v. Prudential Residential Serv., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("The plaintiff has the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her on account of her pregnancy").  Since the plaintiff in this case has offered no direct evidence to support her PDA claim, as this Court previously held in the Memorandum of Decision Granting in Part and Denying in Part Defendants' Motion to Dismiss [Dkt. #24], the case is analyzed under the

burden-shifting framework detailed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Moreover, this Court also previously held that the plaintiff sufficiently alleged a prima facie case of pregnancy discrimination.  [Dkt. #24, at 17-20].

Under the burden-shifting framework, the burden of production now shifts to the defendants to "articulate a legitimate, clear, specific and non-discriminatory reason" for its actions.  *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995); *see also Flores v. Buy Buy Baby, Inc.*, 118 F. Supp. 2d 425, 40-432 (S.D.N.Y. 2000).  Adverse employment actions do not just include termination, they may be indicated by "a demotion evidenced by a decrease in wage or salary, a less distinguished titled, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).  The plaintiff has alleged at least two adverse employment actions in this case: (i) being forced to take FMLA leave earlier than she had anticipated which resulted in its early exhaustion; and (ii) being terminated in January 2011 when her FMLA leave expired.  Both are sufficient to constitute adverse employment actions.  *See Baker v. Connecticut*, No. 3:03cv1894(JCH), 2006 WL 581205, at *8 (D. Conn. 2006) ("[F]orced administrative leave, which appears to have lasted roughly four months, could constitute an adverse employment action because it involved 'significantly diminished material responsibilities' over a significant period of time, such that it could be very disruptive to [plaintiff's] career even if he had not

**23**

been terminated at the end of the lave and even though he was suspended with pay.")

The defendants have offered several non-discriminatory explanations for the adverse employment actions.  First, they allege that the reason the plaintiff was required to take FMLA leave starting in October 2010 was that EASTCONN could not accommodate the plaintiff's pregnancy after the second doctor's note prohibited her from working "closely with children who can become aggressive." [Dkt. #29-1, p. 23].  Second, defendants allege that the termination resulted not from the plaintiff's pregnancy but from the fact that she was unable to return to work at the expiration of her FMLA leave because "of her children's health issues."  [Dkt. #29-1, p. 20-21; Dkt. #1, ¶ 49].  These reasons are sufficiently clear to rebut the presumption of pregnancy discrimination.  *See Flores*, 118 F. Supp. 2d at 431 (finding that defendants' assertions for discharging the plaintiff were sufficient for the applicable burden of production when defendants claimed the reason for termination "was because she did not show up to work when she was scheduled, and because her job performance was deficient").

Therefore, the burden returns to the plaintiff to show, by a preponderance of the evidence, that the defendants' proffered reasons for the adverse employment actions are pretextual.  *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 509 (1993). The defendants' explanations cannot "proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."  *Sabatino v. Flik Int'l Corp.*, 286 F. Supp. 2d 327, 334-335 (S.D.N.Y. 2003 ) (internal quotation marks and citations omitted).  The plaintiff must

24

demonstrate "through direct, circumstantial, or statistical evidence that" the reasons cited are pretextual and "that it is more likely that [she was discharged] because of her pregnancy." *Flores*, 118 F. Supp. 2d at 431 (*citing Gallo*, 22 F.3d at 1226 (2d Cir. 1993). "Unlike the minimal burden of establishing a prima facie case of discrimination, once the defendant has proffered a neutral rationale for the employment action, the factual inquiry proceeds to a new level of specificity." *Id.*

The plaintiff relies on *Quaratino v. Tiffany & Co.*, for support that termination even after delivery could still be labeled discrimination on the basis of pregnancy. [Dkt. #30, p. 20]. The plaintiff there made several factual allegations showing that the pregnancy was the cause of the negative employment treatment. First, the plaintiff alleged that immediately after she told her supervisors of her pregnancy, her next employment evaluations turned drastically negative, even though prior to that disclosure her evaluations were generally positive. Q*uaratino v. Tiffany & Co.*, 71 F.3d 58, 62 (2d Cir. 1995). Second, when she first told her supervisors about her pregnancy, her immediate supervisor used "an expletive," and the supervisor avoided the plaintiff for the rest of the week. *Id.* at 61. Finally, the plaintiff in that case was not told about her ultimate discharge which occurred when she was on leave, but discovered it when she called to advise the human resources department that she would be returning to work. *Id.* at 62. Even though it is unclear whether these facts would have been sufficient to rebut a proffered explanation by the employer, as the district court in that case was reversed on a finding that the plaintiff failed to present a prima facie case, the factual allegations in the present matter are clearly distinguishable.

25

Turner told her employer in April 2010 that she was pregnant.  On April 7, 2010, the plaintiff submitted her first doctor's note which stated that she was prohibited from restraining students who became aggressive out of a concern that restraining students could cause harm to the fetuses.  If the plaintiff's contention is correct that she was discriminated against because of her pregnancy, not because of her subsequent inability to perform essential functions of her employment, we would expect to see manifestations of that discrimination beginning in April.  Unlike in *Quaratino*, there was no immediate negative reaction to the plaintiff's pregnancy as one would expect aside from Dyer's question if she could still perform her duties.  In fact, Turner received a positive evaluation on May 28, 2010, with Dyer stating the plaintiff "is to be commended in several areas.  She is perceptive and brings an attention to details to discussions and planning that is helpful.  Her calm manner is beneficial in a classroom that often ends to respond to students who are upset and reactive.  And she is a supportive and encouraging team member."  [Dkt. #30-4, p. 4].  Moreover, the plaintiff admits that EASTCONN accommodated her first doctor's note by not requiring her to restrain aggressive students throughout the pendency of her pregnancy.  If the defendants were motivated by an anti-pregnancy animus, it is not logical that they would so willingly accommodate the first employment related restriction the plaintiff presented.

On September 7, 2010, the plaintiff presented a second note which stated that the plaintiff "is pregnant with twins and due 12/26/2010 and should not be working closely with children who can become aggressive."  The plaintiff claims

26

that because she was not immediately placed on leave and permitted to provide direct instruction to the students, the defendants' claim that she could not perform the essential functions of her job was pretextual.  On the contrary, the defendants' careful consideration of the note shows that they analyzed possible alternatives before taking the drastic measure of forcing the plaintiff to take FMLA leave.  Indeed, the plaintiff admits that even though accommodations were not made immediately when she submitted the note to Dyer, by September 9, 2010, two days later, she was only performing administrative functions.  [Dkt. 29-11, 86:6-87:25].  The plaintiff also admitted that Dyer told her that human resources was involved in discussing the situation created by the second doctor's note. [Dkt. #29-11, 86:12-22].  Wapen confirmed this by stating that he had various conversations about the new note with Cronin, Dyer, and the plaintiff.  [Dkt. #30-10, 82:7-14].  Even though the plaintiff was performing administrative tasks at the time, Cronin encouraged her to see if she could obtain clarification from her doctor so as to prevent involuntary FMLA leave.  The plaintiff then obtained a third doctor's note stating that the plaintiff "can perform all of her job responsibilities with the exception of having one on one contact with aggressive children."  Ultimately, the defendants' reached the conclusion that the third doctor's note still prevented her from providing direct instruction to the students, and the defendants could not accommodate that restriction because there were no suitable positions available for the plaintiff at that time and there were insufficient administrative tasks to require a full-time position.  This thoughtful, careful, and analytical process shows anything but clear anti-pregnancy animus.

27

Instead, it appears that the defendants genuinely attempted to find a reasonable solution to the plaintiff's pregnancy restrictions.

The timeline in this case also shows weighs against the argument that the defendants were not acting out of an anti-pregnancy animus when they forced the plaintiff to take FMLA leave.  In *Pellegrino v. County of Orange*, the court held that "a four month temporal gap between knowledge of pregnancy and adverse employment action is considered quite weak temporal correction in this Circuit." 313 F. Supp. 2d 303, 317 (S.D.N.Y. 2004) (citing *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001); *Gorman-Bakos v. Cornell Cooperative Extension of Schenectady Co.*, 252 F.3d 545, 554 (2d Cir. 2001) (dismissing employment discrimination claim where time between protected activity and adverse employment action exceeded five months)).  Here, the plaintiff admits that defendants knew about her pregnancy in April, but did not take any adverse employment action until, at the earliest, September.  This five month gap weighs heavily in favor of a finding that the defendants were not motivated by pregnancy hostility.

The plaintiff next argues that the defendants have not met their burden because they have not proved that there were no other available positions at EASTCONN that could serve as a reasonable accommodation.  [Dkt. #30, p. 20]. On the contrary, the plaintiff has the burden of proof on this issue, and she has failed to show that there were open suitable positions.  Regardless, as discussed when analyzing the ADA claims, this Court views that sufficient evidence has

been produced showing that the plaintiff's condition could not be reasonably accommodated.

The plaintiff also argues that Dyer's negative comments when she became aware of the plaintiff's pregnancy and her subsequent behavior prove that she acted out of hostility.  The court in *Reilly v. Revlon, Inc.*, held that negative comments prior to the "birth of a child do not form the basis of a PDA claim," especially when the plaintiff admitted that the defendant "would have reinstated her at the end of her FMLA leave has she been medically capable of returning to work."  *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 546 (S.D.N.Y. 2009).  Just as in *Reilly*, Dyer's comments are alone insufficient to prove that the adverse employment actions were because of the plaintiff's pregnancy.  Moreover, as discussed above, even though Dyer made these comments, the plaintiff received positive feedback from Dyer shortly thereafter, accommodations for her pregnancy, and continued support of the EASTCONN staff until it became impossible to accommodate her enhanced restrictions.  Balancing these facts, Dyer's three minor comments and alleged suspect behavior is insufficient to show that Turner suffered adverse employment action due to her pregnancy.

The plaintiff next argues that the defendants could still have discriminated against her due to her pregnancy by taking action even after her children were born.  [Dkt. #30, p. 20].  We agree with the plaintiff that an employer can violate Title VII by taking adverse employment action against a plaintiff even after delivery if the plaintiff shows that the adverse action was taken due to her pregnancy.  *See Quaratino*, 71 F.3d at 62 (holding that termination even after

29

delivery can still violate title VII if the employee proves that the termination was the result of discrimination).  However, the plaintiff has not proved that it was indeed the pregnancy that was the cause for her termination.  In *Quaratino*, the court highlighted several facts that could give rise to indicia of discrimination, including that the plaintiff alleged she was terminated without even being told of the termination and only found out when she called human resources telling them she planned on returning.  *Id.* at 62.  Moreover, when she tried to get clarity as to the reason for her termination, the employer never returned her calls.  *Id.*

Unlike the plaintiff in *Quaratino,* Wapen called the plaintiff in December asking her if she would be returning to work at the expiration of her FMLA leave.  Even though it is not explained, and indeed shows a lack of compassion, why the defendants denied her alleged request for additional leave, the defendants were under no obligation to permit the plaintiff to extend her leave.  The plaintiff's contention that the defendants determined to fire her in December, before her leave expired, is not supported by the evidence.  The evidence shows that the defendants only determined that the plaintiff would be terminated if she did not return from her FMLA leave.  Wapen stated in his deposition that in December 2010 it was determined that "Rebecca Turner may not be coming back at the conclusion of the FMLA leave, and that based on past practice, agency past practice, that we would be taking her off payroll at the conclusion of the leave, which would have been January 4th."  [Dkt. #30-10, 49:19-25].  He later confirmed this when the plaintiff's lawyer asked him "when did you make the decision that she was going to be denied any extended leave?"  He responded "[t]hat the

30

decision would have been made in late December, as we were nearing the expiration of the actual FMLA leave itself." [*Id.* at 94:1-6]. Contrary to the plaintiff's assertions, this does not prove that the determination to fire the plaintiff was made before her leave expired; it only proves that the defendants had discussed what action would be taken if the plaintiff failed to return at the end of her leave. This is a perfectly appropriate action for an employer to take because nothing in the FMLA requires an employer to ignore its legitimate business interests or operational needs by waiting until an employee on leave affirmatively declares that they will not return before discussing contingency plans. Furthermore, the plaintiff has failed to present any evidence tending to show that her employer acted in bad faith. Unlike in *Quaratino*, the plaintiff was told prior to her termination by her supervisor of her termination and was given a frank explanation for that decision on the call. Had these facts been different, the plaintiff might have raised sufficient evidence making the Court suspicious of the defendants' motives. Yet, the evidence before the Court raises no issues of material fact that could lead a reasonable trier of fact to find for the plaintiff.

Finally, the plaintiff has not demonstrated that she was treated differently than any other employee who failed to return to work following the expiration of FMLA leave. The defendants alleged that other EASTCONN employees have been terminated after their failure to return to work after expiration of their leave, including Ms. Easton, a driver, who took "FMLA leave for reasons other than pregnancy." [Dkt. #29-3, ¶ 21]. In response, the plaintiff stated that "[a]lthough EASTCONN also claims to have terminated others in similar situations, there is

**31**

no evidence provided nor does it show that no discrimination occurred here or in those unknown situations."  [Dkt. #30, p. 20].  While it is true that we cannot discern whether discrimination occurred in those other instances, it is the plaintiff's burden on summary judgment to raise a material issue of fact that would permit a reasonable jury to find in its favor.  The plaintiff has not raised any facts contradicting the defendants' allegations that other employees were fired for not returning from leave.

Given the totality of the evidence, the plaintiff has failed to sufficiently prove that the reasons defendants offered as to the cause of the adverse employment actions were pretextual.[1]

For the foregoing reasons, defendants' summary judgment motion on the plaintiff's Title VII claims is GRANTED.

### C.  FMLA Claims

The plaintiff argues that the defendants violated the FMLA by: (i) interfering with her statutory rights in forcing her to take FMLA leave prior to her due date;

---

[1] The plaintiff also made in the complaint a somewhat nebulous claim that Dyer created a hostile work environment in violation of the PDA.  To establish a hostile work environment in violation of Title VII, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  The plaintiff's allegations that Dyer created a hostile work environment by asking if the plaintiff "could even work," by stating that the plaintiff didn't even "look pregnant," and by peeking into the plaintiff's classroom windows while the plaintiff was on her lunch break making personal phone calls, does not come close to conduct sufficiently severe to meet the standard for an abusive and hostile work environment.

32

and (ii) retaliating against her for taking FMLA leave.  The defendants argue that forcing an employee to take FMLA leave is not interference with the rights bestowed by the statute, and they did not retaliate against the plaintiff for taking FMLA leave in terminating her when she was unable to return to work.

"The FMLA gives eligible employees an entitlement to twelve workweeks per year of unpaid leave because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Spano v. Gengras Motor Cars, Inc.*, 663 F. Supp. 2d 75, 82 (D. Conn. 2009) (internal quotation marks and citations omitted).  The regulations make clear, and the parties here do not dispute, that a "serious health condition" entitling "an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves . . . [a]ny period of incapacity due to pregnancy, or for prenatal care."  29 C.F.R. § 825.114; *see also Harvender v. Norton Co.,* No. 96-cv-653(LEK/RWS), 1997 WL 793085, at *7 (N.D.N.Y. Dec. 15, 1997) ("In the instant case, Norton was informed that Harvender was pregnant, patently a 'serious health condition' under the Act . . . .").  After the twelve week leave period is taken, "the employee has the right to return to the position he held before the leave or its equivalent."  *Wanamaker*, 899 F. Supp. 2d at 204 (internal quotation marks and citations omitted).  "However, if [an employee] is unable to perform an 'essential function of the position because of a physical or mental condition, including the continuation of a serious health condition,' you have no right to reinstatement."  *Id.* citing 29 C.F.R. § 825.216(c).  The "Second Circuit has recognized two distinct causes of action under the FMLA: 'interference' and

**33**

'retaliation.'"  *Potenza v. City of New York*, 365 F.3d 165, 167-68 (2d Cir. 2004);

*Voltaire v. Home Services Systems, Inc.*, 823 F. Supp. 2d 77, 90 (E.D.N.Y. 2011)

("The Second Circuit recognizes a distinction between claims which allege a

violation of § 2615(a)(1) – so-called 'interference' claims – and claims which

allege violations of § 2615(a)(2) and (b), which are called 'retaliation' claims.").

The plaintiff brings claims for both interference and retaliation.

### i.  Interference Claims

in order to assert a prima facie claim for FMLA interference, the plaintiff must

show that: "(1) she is an eligible employee under the FMLA; (2) that the employer

is an employer as defined in the FMLA; (3) that she was entitled to leave under

the FMLA; (4) that she gave notice to the employer of her intention to leave; and

(5) that she was denied benefits to which he was entitled under the FMLA."

*Wanamaker*, 899 F. Supp. 2d at 205 (internal quotation marks, brackets, and

citations omitted).  The defendants do not contest that the first four elements

have been met.  However, they argue that the plaintiff has failed to prove that she

was denied any benefits to which she was entitled because she was given the full

twelve weeks of leave, as required under the statute.  [Dkt. #29-1, p. 29-31].  The

plaintiff concedes that she was given twelve weeks of leave, but argues that the

defendants interfered with her FMLA rights by forcing her to take leave before

she intended to, thus resulting in its premature exhaustion.

The undisputed facts make clear that the plaintiff received twelve weeks of

FMLA leave.  [Dkt. #29-11, 137:15-24].  At the end of this period, Wapen called the

plaintiff and asked her if she was going to return to work.  At that time, the

34

plaintiff said that she could not return and could not provide a date by when she would be ready to return.  Even though her reason for not returning to work is understandable and admirable, the FMLA unfortunately only provides for twelve weeks of leave, and an employee has no absolute right to reinstatement after the leave has expired.  *See Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 534 (S.D.N.Y. 2009) ("Once the twelve weeks of guaranteed leave are exhausted, if the employee does not return to work-for whatever reason, the employer can replace the employee, as long as the employer is not doing so to punish the employee for exercising her FMLA right.").  Here, the plaintiff stated that she was not prepared to return to work at the end of her leave, absent some other interference or claim for retaliation, the defendants did not violate the FMLA by then terminating her.

The plaintiff argues that the interference came when the defendants forced her to take leave involuntarily.  The law is clear in this Circuit that "forced leave, by itself, does not violate any right provided by the FMLA" because "[t]he FMLA says nothing about an employer's ability to 'force' an employee to take such leave."  *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006).  In *Sista*, the defendant was suffering from a serious medical condition that impaired his ability to perform essential functions of his job, and the Court found that involuntarily forcing an employee to take FMLA leave when a serious medical condition impairs an employee's ability to perform employment functions does not interfere with the FMLA.  *Id.*  This Court has already held that the plaintiff's pregnancy made it impossible for her to perform an essential function of her

position: direct instruction.  Accordingly, the involuntariness of the leave is not actionable.[2]

In *Harvender v. Norton Co.*, a pregnant staff technician whose position exposed her to chemicals on a daily basis presented a note from her doctor stating that she "should not be working [with] or exposed to chemicals." *Harvender v. Norton Co.,* 2007 WL 793085 at *1.  The employer subsequently placed the employee on FMLA leave because it found that the employee was unable to perform an essential function of her employment, and it was unable to

---

[2]   The Second Circuit did leave open the issue as to whether a claim would be ripe under the FMLA if an employee claimed FMLA interference when the involuntary leave led its premature expiration.  *Sista*, 445 F.3d at 175 ("If Sista were able to demonstrate that such a forced leave interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA, a cause of action might lie.").  The Sixth Circuit has "recognize[d] that an employer who forces an employee to take leave may create a claim under the FMLA" and that claim ripens only when the employee wishes to take more FMLA leave, but the leave has expired.  *Wysong v. Dow Chem. Co.*, 50 F.3d 441, 449 (6th Cir. 2007).  Conversely, the Eighth Circuit has held that the only claim for interference under the FMLA occurs when an employer prevents an employee from taking twelve weeks of leave; so, as long as the employee is provided twelve weeks of leave, there is no claim for interference even if the employee was required to take those twelve weeks at a time not of his choosing.  *See Walker v. Trinity Marine Products, Inc.*, 721 F.3d 542, 545 (8th Cir. 2013); *see also Colpoys v. Cnty. Of Erie*, 12-cv-908S, 2013 WL 5437635 (W.D.N.Y. Sept. 27, 2013).

This Court does not need to address this circuit split because even where a claim for interference based on involuntariness is permitted, a claim is actionable only if "the employee, when placed on involuntary leave, did not have a serious health condition that precluded her from working."  *Kleinser v. Bay Park Cmty. Hosp.*, 793 F. Supp. 2d 1039, 1045 (N.D. Ohio 2011) (citing *Harris v. Metro Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 484 (6th Cir. 2010)).  Here, this Court has found that the plaintiff did have a serious health condition, pregnancy, and this condition precluded her from performing an essential employment function.  Therefore, the employer was permitted under the FMLA to force her to take FMLA designated leave.

accommodate the conditions of her pregnancy.  *Id.*  It also told the employee that "if she were unable to return to her job as of May 15, 1996, the end of her twelve week unpaid leave, [the employer] would consider her as having terminated her employment."  *Id.* at *1.  The Court granted summary judgment in favor of the defendant because the FMLA does not require that the exercise of its benefits be voluntary.  *Id.* at *7.  The facts of this case are nearly identical to those here, and this Court approves the analysis in *Harvender*.  Turner was unable to work closely with aggressive children; given that her teaching position for the academic year risked continually exposing her to aggressive children, the defendants forced her to take FMLA leave with the express condition that she may be terminated if she was unable to return when the leave expired.  This was permissible under the statute, and since the plaintiff does not contest that she was permitted to take the entire twelve week leave period, there are no material facts in dispute that could permit a finding of interference under the FMLA.

### ii.  Retaliation

"The Second Circuit has stated that, '[i]n order to make out a *prima facie* case [of FMLA retaliation], [the plaintiff] must establish that: (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.'" *Wanamaker*, 899 F. Supp. 2d at 206-07, *quoting Potenza*, 365 F.3d at 167-68. Accordingly, "[t]he plaintiff must demonstrate that her taking FMLA leave constituted 'a negative factor in Defendant's] decision to terminate him or her."

*Wanamaker*, at *11.  Retaliation claims under the FMLA are analyzed pursuant to the burden shifting framework established in *McDonnel Douglas v. Green*, 411 U.S. 792 (1973).  *Wanamaker*, 899 F. Supp. 2d at 207.  Under this test, "the plaintiff must first establish a prima facie case of discrimination.  If the plaintiff establishes a prima facie case, a presumption that the employer unlawfully discriminated against the plaintiff is raised and the burden of production then shifts to the employer to articulate a clear, specific and non-discriminatory reason for its actions."  *Id.* (internal quotation marks and citations omitted).  "The employer's burden is merely one of production, not persuasion; it can involve no credibility assessment.  If the employer satisfies that burden, the plaintiff has the burden to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination."  *Id.*  "In addition, the plaintiff must submit evidence that would permit a rational fact-finder to infer that the discharge was actually motivated, in whole or in part, by discrimination."  *Id.*

The defendants argue that the plaintiff cannot meet the prima facie threshold because she was unqualified when she was terminated as she refused to return to work.  [Dkt. #29-1, p. 35; Dkt. #29-11, 132:16-25].  In response, the plaintiff argues that she was qualified because the defendants have admitted that the plaintiff was qualified for her position at the time leave was taken.  [Dkt. #30, p. 26-27].

"The relevant time for determining whether a plaintiff is 'qualified' is the date of the allegedly adverse employment action."  *McFarlane v. Chao*, No. 04cv4871(GBD)(HBP), 2007 WL 1017604, at *22 (S.D.N.Y. March 30, 2007) (citing

38

*Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1999); *Karn v. Williams Advanced Materials*, 02-cv-0852E(F), 2006 WL 361973, at *2 (W.D.N.Y. Feb. 15, 2006); *Henzel v. Delaware Otsego Corp.*, 285 F. Supp.2d 271, 277, n.8 (N.D.N.Y. 2003); *Meling v. St. Francis Coll.*, 95-cv-3739(JG), 1997 WL 106868, at *4 (E.D.N.Y. April 1, 1997); *Gallo*, 22 F.3d at 1224 (2d Cir. 1994)).  As stated earlier, once FMLA leave is exhausted, "if the employee is unable to perform an essential function of the position, . . . she is not entitled to restoration of her position."  *Negal v. County of Orange*, No. 09-cv-9960(CS), 2013 WL 1285465, at *4 (S.D.N.Y. March 28, 2013) (internal quotation marks and citations omitted).  "Thus, an employee is not qualified for her position if she cannot return for work when the FMLA leave is exhausted."  *Id.*  Here, the plaintiff admitted that she would not return to work at the expiration of her FMLA leave.  Therefore, she has failed to present a prima facie case for FMLA retaliation because she was unqualified for the position at the time of her termination.

Even if the plaintiff had sufficiently alleged a prima facie case of FMLA retaliation, she has failed to refute the defendants' neutral and non-discriminatory explanation for her termination.  Under the burden shifting framework, the plaintiff is required to refute the defendants' claim that the reason for her adverse treatment was that she was unable to return to work at the expiration of her FMLA leave.  The plaintiff has failed to respond to this claim, arguing summarily that "there are at least genuine issues of material fact that preclude judgment for the Defendants if not outright grounds for judgment in Plaintiff's favor" on the FMLA claim.  [Dkt. #30, p. 27].  Even drawing all reasonable inferences in favor of the

39

plaintiff, this Court finds that the plaintiff has not rebutted defendants' explanation that the real reason for her termination was her refusal to return to work.  Indeed, it would be strange if the defendants forced her to take FMLA leave because of her pregnancy and then retaliated against her for taking such leave. The plaintiff has not raised any facts or presented any arguments showing that the real reason for her termination was her exercise of her FMLA rights.

Accordingly, since the plaintiff has not met her burden in arguing either FMLA interference or retaliation, defendants' motion for summary judgment is GRANTED.

Since the defendants have been granted summary judgment on the FMLA claims, the Court does not examine the defendants' argument that they are entitled to qualified immunity under the FMLA.

IV.    Remaining State Law Claims

Having granted summary judgment as to the federal law claims against the defendants, the Court declines to exercise its supplemental jurisdiction over the plaintiff's remaining state law claims.  "Supplemental or pendent jurisdiction is a matter of discretion, not of right.  Thus, the court need not exercise supplemental jurisdiction in every case." *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165-66 (D. Conn. 2005) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 715-726 (1966)).  "The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants. . . . In addition, the court may decline to exercise supplemental jurisdiction where the court has dismissed all claims over which it

**40**

has original jurisdiction." *Id.* (citing 28 U.S.C. § 1367(c)(3)); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").  Since the remaining claims are purely dependent on state law, some of which lack precedential authority, the Court declines to exercise supplemental jurisdiction, and they are DISMISSED without prejudice to pursuing the remaining claims in state court.

### V.      Conclusion

For the foregoing reasons, Defendants' [Dkt. #29] Motion for Summary Judgment is GRANTED as to the plaintiff's claims under the ADA, Title VII, and the FMLA.  Since all of the federal claims have been dismissed in this case, the Court does not need to address the defendants' claim that they should receive qualified immunity under the FMLA, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

IT IS SO ORDERED.


_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: December 2, 2013


41